**Rubin SIRA, Plaintiff–Appellee,**

v.

**R. MORTON, C. Artuz, D. Selsky, and G. Goord, Defendants–Appellants.**

Docket No. 03–0156.

United States Court of Appeals, Second Circuit.

Argued: March 18, 2004.

Decided: Aug. 2, 2004.

Amended: Aug. 17, 2004.

---

John E. Knudsen, Assistant Attorney General (Marion R. Buchbinder, of counsel) for Eliot Spitzer, Attorney General of the State of New York, New York, New York, for Defendants–Appellants.

Joel Landau, Prisoners' Legal Services of New York (Tom Terrizzi, of counsel), Albany, New York, for Plaintiff–Appellee.

Before: SACK and RAGGI, Circuit Judges, and TRAGER, District Judge.*

RAGGI, Circuit Judge.

Plaintiff–Appellee Rubin Sira, who is presently incarcerated by the State of New York as a result of his 1995 conviction on narcotics, robbery, and weapon charges, see People v. Sira, 254 A.D.2d 311, 680 N.Y.S.2d 101 (2d Dep't 1998), sues Glenn S. Goord, the Commissioner of the New York State Department of Correctional Services; Donald Selsky, the Director of the Department's Special Housing/Inmate Disciplinary Program; Robert Morton, a Department Captain who serves as a Discipline Hearing Officer; and Christopher Artuz, the Superintendent of Green Haven Correctional Facility, in their individual capacities pursuant to 42 U.S.C. § 1983 for depriving him of liberty without due process in connection with prison disciplinary action taken against him on February 8, 2000. Defendants–Appellants, who moved for judgment on the pleadings on the ground of qualified immunity, now appeal from an order of the United States District Court for the Southern District of New York (Denise Cote, Judge) converting their motion to one for summary judgment and denying it. See Sira v. Morton, No. 02 Civ. 1567, 2003 WL 1900847 (S.D.N.Y. Apr. 17, 2003). They submit that (1) the conversion of their motion was unwarranted and prejudicial and (2) qualified immunity bars Sira from suing them for disciplinary action purportedly taken without (a) adequate notice of the charges, (b) disclosure of the evidence relied upon, and (c) sufficient evidence of misconduct.[1]

We reject defendants' conversion challenge as without merit. With respect to their qualified immunity argument, we affirm the district court's denial of summary judgment on Sira's due process claims of inadequate notice and non-disclosure of evidence. We reverse the denial of summary judgment on Sira's sufficiency challenge because, although Sira presents a viable due process claim, defendants could reasonably have thought that their conduct conformed to established law with respect to assessing the reliability of evidence supplied by confidential informants. On remand, judgment should be entered in favor of defendants on this point.

## BACKGROUND

### I. The Misbehavior Charges

On January 19, 2000, Rubin Sira, then incarcerated at Green Haven Correctional Facility, was served with a written misbehavior report drafted by Lieutenant G. Schneider charging him with violations of prison disciplinary rules 102.10 and 104.12. Rule 102.10 states: "Inmates shall not, under any circumstances make any threat,

---

* The Honorable David G. Trager, United States District Court for the Eastern District of New York, sitting by designation.

1. Defendants do not urge us to undertake individual analyses of their qualified immunity claim based on their discrete roles in Sira's disciplinary action. Accordingly, we do not distinguish among defendants in reviewing their arguments on this appeal.

spoken, in writing, or by gesture"; rule 104.12 provides: "Inmates shall not lead, organize, participate, or urge other inmates to participate, in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of facility." 7 N.Y.C.R.R. § 270.2(B).

The report described the incident giving rise to these charges as follows:

> During the course of an investigation into a planned inmate demonstration at this facility in which inmates would conduct a work/program stoppage on or about January 1, 2000, Inmate Sira has been identified through confidential sources as having urged other inmates to participate, organized inmates to participate and threatened inmates to participate.

Sira Misbehavior Report at 1. In response to specific inquiries on the report form, Lt. Schneider indicated that (1) the date of the charged incident was January 19, 2000; (2) the incident time was 10:15 a.m.; (3) the incident location was Green Haven Correctional Facility; and (4) no persons other than Sira were involved in the incident.

The work stoppage described in Sira's misbehavior report was commonly referred to at Green Haven as the "Y2K strike," a reference to its scheduled New Year's 2000 date. To avert the strike, prison officials had ordered an inmate lockdown beginning on December 24, 1999, and lasting through January 6, 2000. In fact, once the lockdown ended, a prison strike did occur, with many inmates refusing to follow the schedules established by correction authorities.

## II. *The Disciplinary Hearing*

### A. *Proceedings in Sira's Presence*

To address Sira's charged role in the strike, a Tier III disciplinary hearing commenced on January 26, 2000, presided over by Captain Robert Morton. *See* N.Y.C.R.R. §§ 254.3, 270.3. At the hearing, Sira pleaded not guilty to the charged offenses and moved for their dismissal on the ground that the misbehavior report did not provide him with adequate notice of the conduct at issue. Specifically, he complained that the report failed (1) to identify any person whom he had threatened or organized; (2) to indicate where in Green Haven the alleged misconduct had occurred; and (3) to provide clear notice of the date of his alleged misconduct, since the incident date on the report was marked January 19, while the body of the report suggested that the strike had occurred sometime earlier, possibly before January 1. Sira denied urging or threatening anyone to participate in the Y2K strike and noted that he had no history of discipline problems in prison and had not missed his work assignments during the strike. Further, he cited prison records showing that he was in the Health Services unit on the morning of January 19.

Capt. Morton denied Sira's request to dismiss the charges. While acknowledging that the report was "very vague" with respect to the incident date—"that actually could mean that on January 19th you were identified or it could mean that the investigation was conducted on the 19th or it was concluded on the 19th," Hearing Tr., Jan. 26, 2000, at 13—and that Green Haven is a "large" facility housing approximately 2200 inmates, Morton nevertheless concluded that the report provided Sira with adequate notice of the date, time, and place of the charged conduct: "this misbehavior report indicates the date as January 19, 2000, [time of] incident, 10:15 a.m., and place of incident, Green Haven Correctional Facility," *id.* at 36. Morton stated that he would call complaining officer Schneider to testify in support of the charges and to answer approved questions posed by

Sira. Morton further advised that at some point in the proceedings, he would hear evidence outside Sira's presence to "make a personal assessment of the credibility" of the confidential sources whose information supported the disciplinary charges. *Id.* at 10, 27.

On January 31, 2000, Lt. Schneider testified in Sira's presence that from shortly before the December 24, 1999 lock down through the month of January, prison officials had investigated the Y2K strike. From various confidential sources, the officers had learned that Sira had assumed leadership of a group of Dominican inmates, that he was the "Captain" of "C Block,"[2] and that he had endeavored to enforce participation in the Y2K strike by threatening inmates. Hearing Tr., Jan. 31, 2000, at 4–6. Lt. Schneider stated that no source had indicated that Sira had threatened any particular inmate; rather, the sources disclosed that Sira had made "open threats to any one who would go against the strike." *Id.* at 15. She did not detail the nature of these threats, nor did she indicate any dates on or about when threats or other charged conduct occurred. Lt. Schneider did, however, clarify that the report's reference to January 19 at 10:15 a.m. alluded to the date and time she filed the disciplinary charges, not the date and time of any misconduct.

In light of Lt. Schneider's testimony, Sira reiterated his objection to the written notice, arguing that the January 19 incident date on the misbehavior report was plainly inaccurate, and the reported location, Green Haven Correctional Facility,

was unnecessarily general. Capt. Morton again rejected Sira's challenge. He observed that Lt. Schneider had satisfactorily explained why January 19, 2000, at 10:15 a.m. was mistakenly noted in the report as the incident date and time. Morton further concluded that the report's reference to January 1, 2000, as the planned strike date provided Sira with sufficient notice of the approximate date and time of his alleged misconduct. He also concluded that the report's identification of Green Haven as the site of the misconduct was adequate.

## B. *Confidential Proceedings*

Beginning on February 5, 2000, and continuing through February 8, Capt. Morton heard testimony out of Sira's presence from Lt. Schneider, Sgt. Kaiser, and Corrections Officer G. Williams about information received from five confidential sources (referred to herein as "Informants 1–5"), each of whom implicated Sira in the Y2K strike.[3]

### 1. *Informant 1*

Lt. Schneider identified Informant 1 by name as an inmate who had provided reliable information in the past that had helped prison authorities prevent the death of another inmate. Informant 1 told Lt. Schneider that sometime after prison officials lifted the first December 1999 lockdown, Informant 1 had attended a strike organization meeting in Building 12 run by an inmate named Codorel who discussed with those present the "chaos" that was to be caused during the strike and the

---

**2.** Green Haven's 2200 inmates are housed in nine different "blocks," lettered A through J. The facility also includes a mess hall, hospital, visiting rooms, and work and education areas.

**3.** A sixth informant was identified during the confidential hearing. Apparently this informant sent a letter to Sgt. Kaiser stating that

Sira had urged and coerced other inmates to participate in the strike. However, since this letter was not part of the record in the district court, nor is it in the record on appeal, we do not consider it. *See* Fed.R.Civ.P. 56(c); *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir. 2001).

inmates who would be in charge of strike activities in each housing block. Hearing Tr., Feb. 5, 2000, at 8. Codorel identified Sira as the person "who would enforce C Block." *Id.* at 6. Informant 1 did not place Sira at the Building 12 meeting, nor did he report ever seeing Sira participate in any strike-related activities. Lt. Schneider explained that she credited Informant 1's account of the meeting because his statements with respect to other participants were consistent with information already obtained by officers in their strike investigation.

### 2. *Informant 2*

Lt. Schneider identified Informant 2 as an "honor block inmate" who had volunteered to gather intelligence for prison authorities in order to avert the harm that would attend a Y2K strike. Informant 2 reported that Sira, who was housed in Block C, was one of the strike coordinators and that he met with other gang leaders at night in Building 12 and in the morning in the pre-release center to organize strike activities. Informant 2 did not have personal knowledge of these facts, nor had he ever personally witnessed Sira engaging in any strike-related activities. He disclosed only what he had learned from "asking around." Hearing Tr., Feb. 5, 2000, at 13. Apparently, Capt. Morton did not ask Lt. Schneider to ascertain from Informant 2 the circumstances under which or the persons from whom he had learned the facts reported to determine whether such factors supported or undermined the reliability of the hearsay disclosures.

### 3. *Informant 3*

Lt. Schneider and Sgt. Kaiser identified Informant 3 as an inmate who had sent Kaiser an unsigned letter dated December 27, 1999, which was received in evidence but not shared with Sira. Therein the author revealed, among other things, that he had overheard one unidentified prisoner telling another that he and "Ruben" were going to "take over" the Dominicans. Dec. 27, 1999 Letter at 1. "Ruben" was described as "the guy in J–Block who works with Father Fernando on Sunday Mass." Id. Apparently, this sufficed to permit Sgt. Kaiser and Lt. Schneider to identify "Ruben" as Rubin Sira, although neither witness specifically testified on this point. Kaiser did testify that from the use of "smiley faces" in the letter, he determined that the author was an inmate who had previously provided him with reliable information "98 percent of the time." Hearing Tr., Feb. 6, 2000, at 3. Further, prison officials credited the letter because much of the information it disclosed with respect to anticipated conduct by other persons proved true.

### 4. *Informant 4*

Lt. Schneider identified Informant 4 as an inmate who had sent a letter to Superintendent Artuz, which reported a meeting occurring that morning in connection with "the pre-release call-out held in J–School." Undated Letter to Superintendent at 1. The letter, which was also admitted into evidence but not disclosed to Sira, identified a dozen strike organizers by name, including "Ruben Cira of pre-release." [4] *Id.* In passing on the letter to subordinate officers, Artuz did not disclose his source's name, but he did reveal that the source had often given him reliable information in the past. Lt. Schneider testified that she deemed the source credible because his letter accurately described the planning of events that thereafter transpired. Here again, Capt. Morton did not ask Lt.

---

**4.** The letters ascribed to Informants 3 and 4, which are part of the record in this case, have been redacted by defendants to avoid disclosure of any inmate names other than Sira's.

Schneider to inquire how Informant 4 learned the information disclosed or even if it was based on direct knowledge or hearsay.

### 5. *Informant 5*

Lt. Schneider and Officer Williams identified Informant 5 by name as an inmate whom Williams had "used in the past, with ninety percent accuracy and without any specific . . . gains on [the] inmate's part." Hearing Tr., Feb. 8, 2000, at 4. Sometime in the period December 1999 through January 2000, Informant 5 told Williams that he had personally observed Sira "basically coerce[ ] inmates through strong arm tactics and threats of violence to participate in certain stages of the demonstration that we witnessed here at Green Haven during the last months of 1999." *Id.* at 5. Informant 5 identified Sira as an inmate housed on the west side of Green Haven, who was involved in the prison's J–School pre-release program and who was a leader of a faction of Dominican inmates at the prison. Williams explained that Informant 5 had provided this information to avoid the violence that he thought would result from a prison strike. Apparently no effort was made to identify the inmates purportedly threatened by Sira. Nor were officers asked to have Informant 5 detail what he heard or saw that led him to characterize Sira's conduct as coercive or threatening.

Capt. Morton did specifically inquire of Lt. Schneider, Sgt. Kaiser, and Officer Williams whether any of the five confidential sources would agree to appear before him to testify to the information supplied. Uniformly, the officers stated that the informants would not so agree because any appearance would inevitably become known throughout the prison, jeopardizing the informants' safety and exposing them to reprisals.

### C. *The Remaining Open Proceedings and the Disciplinary Ruling*

On February 8, 2000, the disciplinary hearing continued with Sira present. Once again, he protested the inadequate notice afforded by the misbehavior report. Further, while conceding that he had no right to know the identity of the confidential sources who had provided information against him, Sira asserted that he was entitled to know the substance of their allegations. Capt. Morton adhered to his earlier ruling rejecting Sira's notice challenge; he also refused to disclose the confidential information revealed at the *ex parte* hearing.

In his written disposition of the charges issued the same day, Capt Morton stated that based upon the initial misbehavior report, Lt. Schneider's testimony, and the confidential evidence, he found Sira guilty of organizing inmates to participate in the charged prison demonstration, *see* 7 N.Y.C.R.R. § 270.2(B), rule 104.12, but not guilty of making threats, *see id.*, rule 102.10. Morton sentenced Sira to six months' confinement in a Special Housing Unit, effective immediately, during which time he would lose certain prison privileges relating to receipt of mail, telephone use, and commissary visits. Further, Morton recommended that Sira lose six months' good-time credit toward his release date.

### III. *Administrative Appeal of the Disciplinary Ruling*

Proceeding *pro se*, Sira appealed Morton's disciplinary ruling to Commissioner Goord, *see* 7 N.Y.C.R.R. § 254.8, citing five grounds for reversal: (1) the hearing officer's failure to complete the hearing within the time required by New York law; (2) the failure to provide Sira with adequate notice as to the date, time, and place of the alleged misconduct; (3) the hearing offi-

cer's failure to disclose non-life-threatening information supplied by confidential sources; (4) his failure to make adequate fact findings with respect to misconduct; and (5) the insufficiency of the evidence of misconduct. Acting on behalf of Commissioner Goord, Director Selsky initially affirmed the disciplinary decision in a summary ruling dated April 7, 2000. With the assistance of counsel, Sira sought reconsideration. On September 8, 2000, Selsky reversed the disciplinary ruling, concluding simply that the "confidential evidence failed to support [the] charge." By that time, Sira had already served his sentence in the Special Housing Unit; nevertheless, the reversal prevented him from losing good-time credits.

## IV. *The Federal Lawsuit*

On February 28, 2002, Sira filed this § 1983 action, alleging that defendants violated his right to due process by finding him guilty (1) based upon insufficient evidence, (2) without providing him adequate notice of the charges, (3) without affording him access to confidential evidence relevant to his defense, (4) without assessing the reliability of various confidential sources of incriminating information, and (5) without disclosing the confidential documentary evidence against him. Defendants filed an answer denying the relevant allegations and moved for judgment on the pleadings based on qualified immunity, *see* Fed.R.Civ.P. 12(c). The district court converted the motion to one for summary judgment and denied it, ruling that Sira had established a due process violation and that no reasonable officer could have thought otherwise. *See Sira v. Morton,* 2003 WL 1900847, at *6–*7. Defendants filed this timely appeal.

### Discussion

## I. *Jurisdiction*

■ It is settled law that a denial of summary judgment is ordinarily not a final

judgment from which an appeal will lie. An exception exists, however, when government officials seek summary judgment on the ground of qualified immunity, and the court denies the motion as a matter of law. *See Bernard v. County of Suffolk,* 356 F.3d 495, 501–02 (2d Cir.2004); *Luna v. Pico,* 356 F.3d 481, 486 (2d Cir.2004); *Kinzer v. Jackson,* 316 F.3d 139, 142–43 (2d Cir.2003). Such an order is collateral to the merits of the underlying action and is, therefore, considered final for appellate purposes. *See Mitchell v. Forsyth,* 472 U.S. 511, 528–30, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002). Here, defendants appeal the district court ruling that the evidence, when viewed most favorably to Sira, does not, as a matter of law, support their claim of qualified immunity. We therefore have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## II. *Conversion of the Motion for Judgment on the Pleadings to a Motion for Summary Judgment*

■ Before addressing the merits of defendants' qualified immunity claim, we consider their challenge to the district court's order converting their motion for judgment on the pleadings, *see* Fed.R.Civ.P. 12(c), to a motion for summary judgment, *see* Fed.R.Civ.P. 56.

### A. *The Need to Convert Defendants' Motion*

A district court must convert a motion for judgment on the pleadings to one for summary judgment if the motion includes material "outside the pleadings" and that material is "not excluded by the court." Fed.R.Civ.P. 12(c). In this case, defendants attached to their motion (1) Sira's

misbehavior report, (2) the full transcript of the non-confidential portion of his disciplinary hearing, (3) the full transcript of the confidential portion of the hearing, (4) the disposition ruling by Capt. Morton, and (5) Director Selsky's reversal order. Although none of these documents was attached to Sira's complaint or to defendants' answer, defendants maintain that all were fairly incorporated into the complaint and, therefore, not outside the pleadings.

A complaint is deemed to include any written instrument attached to it as an exhibit, *see* Fed.R.Civ.P. 10(c); *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir. 1985), materials incorporated in it by reference, *see Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991), and documents that, although not incorporated by reference, are "integral" to the complaint, *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002); *see Cortec Indus.,* 949 F.2d at 47. Here, Sira's complaint explicitly refers to and relies upon two of the documents at issue, the misbehavior report and the disposition sheet, *see* Complaint ¶¶ 35–42, 66, to show that Sira was deprived of liberty without adequate notice of the charges against him. These documents are thus incorporated by reference into the complaint.

Although the complaint does not expressly cite the reversal order, this document is also incorporated into the pleading because reversal was integral to Sira's ability to pursue a § 1983 challenge to procedures that caused him to lose good-time credits. *See Edwards v. Balisok,* 520 U.S. 641, 648, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997) (holding that prisoner who files a § 1983 action challenging discipline procedures resulting in loss of good-time credits must show that the conviction has been overturned); *see also Heck v. Humphrey,* 512 U.S. 477, 489, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (explaining that rever-

sal rule does not simply "engraft an exhaustion requirement upon § 1983, but rather den[ies] the existence of a cause of action" absent reversal). In *Muhammad v. Close,* 540 U.S. 749, ——, 124 S.Ct. 1303, 1306, 158 L.Ed.2d 32 (2004) (per curiam), the Supreme Court recently clarified that a § 1983 action challenging the validity of a disciplinary sanction that does not affect the overall length of the prisoner's confinement may be brought regardless of whether the sanction was overturned. But that is not this case. Absent the reversal order, Sira's procedural challenges would necessarily have implicated the invalidity of the loss of his good-time credits. *See Heck v. Humphrey,* 512 U.S. at 481–82, 114 S.Ct. 2364. Accordingly, the reversal order is fairly deemed incorporated.

The hearing transcripts, however, are another matter, being neither expressly cited in the complaint nor integral to the claims raised. Defendants nevertheless assert that Sira's paraphrasing of certain events occurring during parts of the disciplinary hearing and his single quotation of one excerpt from Lt. Schneider's testimony, *see* Complaint ¶¶ 45–64, incorporate the whole of these transcripts by reference into the complaint. We disagree. Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint. *See Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989) (rejecting argument that short quotations from an annual report and 10K statement incorporated those documents into the complaint). Because the hearing transcripts were not incorporated into the complaint and because the district court did not exclude those documents from its consideration of defendants' motion, we conclude that the district court was required to convert the motion to dismiss

into one for summary judgment. *See* Fed. R.Civ.P. 12(c).

### B. *Prejudice from the Conversion*

Rule 12(c) provides that when a court converts a motion for judgment on the pleadings into one for summary judgment, it shall provide "all parties ... a reasonable opportunity to present all material made pertinent to such a motion." Here, the district court did not notify the parties prior to converting the motion. Defendants assert that this failure requires reversal because they were prejudicially denied an opportunity to present all pertinent material as required by Rule 12(c). Here again, we disagree.

■ A party is deemed to have notice that a motion may be converted into one for summary judgment if that party "should reasonably have recognized the possibility" that such a conversion would occur. *Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir.1999). By attaching to their motion extensive materials that were not included in the pleadings, defendants plainly should have been aware of the likelihood of such a conversion. *See id.* Under such circumstances, they cannot complain that they were deprived of an adequate opportunity to provide the materials they deemed necessary to support their motion. *See M.J.M. Exhibitors, Inc. v. Stern (In re G. & A. Books, Inc.)*, 770 F.2d 288, 295 (2d Cir.1985).

■ In any event, defendants cannot demonstrate prejudice. Their complaint is not, after all, that judgment was entered in favor of Sira without affording them a full opportunity to be heard. Their complaint is that judgment was not entered in their favor. But if defendants could not establish their entitlement to qualified immunity on a presentation that supplemented the pleadings, they would certainly not have fared better had the district court ignored

their attachments and treated their motion as one to dismiss. To the extent defendants submit that *sua sponte* conversion deprived them of the opportunity to submit affidavits or to discover evidence that might have strengthened a summary judgment motion, we note that district courts enjoy considerable discretion in entertaining successive dispositive motions. *See Kovacevich v. Kent State Univ.*, 224 F.3d 806, 835 (6th Cir.2000) ("District courts may in their discretion permit renewed or successive motions for summary judgment ....."); *Enlow v. Tishomingo County*, 962 F.2d 501, 507 (5th Cir.1992); *see also* 10A C. Wright, et al., *Federal Practice and Procedure* § 2712, at 215 (3d ed.1998). The district court has not here precluded the defendants from filing a further motion for summary judgment at the conclusion of discovery; thus, we discern no prejudice from the challenged conversion warranting reversal.

### III. *Defendants' Qualified Immunity Claim*

#### A. *The Legal Framework for Qualified Immunity Analysis*

We review *de novo* the district court's denial of summary judgment on defendants' claim of qualified immunity. *Luna v. Pico*, 356 F.3d at 486. Summary judgment is appropriate if the evidence offered, viewed in the light most favorable to the non-moving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 760 (2d Cir.2003); *see also* Fed. R.Civ.P. 56(c).

In evaluating a summary judgment motion based on qualified immunity, we perform a two-part test. We ask first whether the facts, viewed in the light

most favorable to the plaintiff, establish a constitutional violation. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If they do not, the plaintiff may not recover because he has suffered no wrong cognizable under § 1983. *See id.* If the facts do establish a constitutional violation, however, we proceed to a second inquiry, asking "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151. If a reasonable officer could have believed that the challenged conduct was lawful at the time of the violation, then qualified immunity bars the claim. *See id.; Luna v. Pico,* 356 F.3d at 490.

### B. *Inmate Due Process Claims*

■ The Fourteenth Amendment to the Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship. *See Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (describing rights that must be afforded before revocation of good-time credits); *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (per curiam) (concluding atypical confinement may not be imposed without providing procedures enumerated in *Wolff*); *see also Luna v. Pico,* 356 F.3d at 487 (same). Given the procedural posture of this case, we assume, without deciding, that Sira's six-month confinement in the special housing unit imposed an atypical hardship entitling him to due process. *See generally*

*Kalwasinski v. Morse,* 201 F.3d at 107–08 (discussing factors relevant to deciding if confinement in special housing unit constitutes an atypical hardship).

■ The due process protections afforded a prison inmate do not equate to "the full panoply of rights" due to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. at 556, 94 S.Ct. 2963. Notably, there is no right to counsel or to confrontation at prison disciplinary hearings. *See id.* at 567–70, 94 S.Ct. 2963. Nevertheless, an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *See id.* at 563–67, 94 S.Ct. 2963; *accord Luna v. Pico,* 356 F.3d at 487; *Kalwasinski v. Morse,* 201 F.3d at 108. Since *Wolff,* the Supreme Court has clarified that judicial review of the written findings required by due process is limited to determining whether the disposition is supported by "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). This standard is extremely tolerant and is satisfied if "there is *any* evidence in the record that supports" the disciplinary ruling. *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000). Nevertheless, as this court recently explained, the "some evidence" standard requires some "reliable evidence." *Luna v. Pico,* 356 F.3d at 488; *see Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001).

### C. *Sira's Due Process Claim*

Sira's due process claim points to three procedural deprivations: (1) inadequate notice, (2) non-disclosure of confidential ev-

idence relied on to support the disciplinary ruling, and (3) insufficient evidence of misconduct. We address defendants' qualified immunity defense as it pertains to each of these issues.

### 1. Inadequate Notice of the Charges

### a. The Due Process Violation

■ Due process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing. See Wolff v. McDonnell, 418 U.S. at 564, 94 S.Ct. 2963; Kalwasinski v. Morse, 201 F.3d at 108. Sira acknowledges that he received the challenged misbehavior report within the prescribed time; his complaint is that the report charge was too general to provide meaningful notice of the misconduct at issue and in fact misleading as to the incident date.

The notice required by due process is no empty formality. See Taylor v. Rodriguez, 238 F.3d at 192; Benitez v. Wolff, 985 F.2d 662, 665 (2d Cir.1993). Rather, notice serves to "compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." Taylor v. Rodriguez, 238 F.3d at 192–93 (quoting McKinnon v. Patterson, 568 F.2d 930, 940 n. 11 (2d Cir.1977)); see Benitez v. Wolff, 985 F.2d at 665. Toward this end, due process requires more than a conclusory charge; an inmate must receive notice of at least some "specific facts" underlying the accusation. Taylor v. Rodriguez, 238 F.3d at 193. Such notice is especially important where, as in this case, large parts of the disciplinary hearing are conducted outside the inmate's presence. The law recognizes that legitimate concerns for inmate safety may

sometimes require confidential proceedings, see Wolff v. McDonnell, 418 U.S. at 566–67, 94 S.Ct. 2963, but, in such circumstances, there is a particular due process interest in requiring some factual specificity in the misconduct notice. See Henry J. Friendly, Some Kind of Hearing, 123 U. Pa. L.Rev. 1267, 1281 (1975) ("the more forthcoming" the notice, "the stronger should be [an agency's] position in asking curtailment of other procedures" associated with due process).

■ In Taylor v. Rodriguez, this court rejected as "vague or conclusory" a notice that informed an inmate that he was being considered for special confinement based on past acknowledged membership in the "Latin Kings" gang, "recent tension in B–Unit involving gang activity," and unspecified "statements by independent confidential informants." 238 F.3d at 193; see also Powell v. Ward, 643 F.2d 924, 933 (2d Cir.1981) (affirming district court conclusion that charging inmate without disclosing what rule was broken violated due process). Sira's notice is similarly devoid of specific facts to support the otherwise conclusory allegation that he had "urged ..., organized ..., and threatened inmates to participate" in the Y2K strike. Sira's Misbehavior Report at 1. Certainly, the report identifies no inmates toward whom Sira's alleged misconduct was directed. It describes no words, actions, or means employed by Sira to further the strike. It mentions no sites within the prison where Sira allegedly engaged in the charged conduct. Instead, by identifying the incident site as the whole of Green Haven, the report essentially provided Sira with no notice of where within his then-limited universe his misconduct was alleged to have occurred. Moreover, to the extent the report identifies the date and time of the incident as January 19, 2000, at 10:15 a.m., the document is affirmatively

misleading. As Lt. Schneider testified, that date and time correspond to her filing of the disciplinary charges, not to any particular misconduct by Sira.

Defendants assert that the latter error is of no import because Sira was served with the misbehavior report approximately ten minutes after its January 19 filing and could not reasonably have thought he was being charged with misconduct at that date and time. A review of the evidence in the light most favorable to Sira does not compel such a conclusion. A reasonable person might well have interpreted the report to charge Sira with misconduct on January 19 in attempting to rekindle the Y2K strike. So far as the record reveals, Sira thought it was conduct on January 19 that he had to defend: on the first day of the disciplinary hearing, he sought to document his whereabouts on the morning of that date.

Alternatively, defendants insist that the report's reference to January 1, 2000, provided Sira with adequate notice that his misconduct was alleged to have occurred on or about that date. In fact, the report states only that the strike was to occur on January 1 (which it apparently did not because of the lockdown). Nowhere does the report give notice as to whether his charged conduct allegedly occurred before or after January 1, or whether his actions spanned a day, week, month, or longer.

In urging us to ignore any incongruity in the dates cited in the misbehavior report, defendants point to *Kalwasinski v. Morse,* a case in which an inmate was charged with threatening to kill three corrections officers but where hearing evidence revealed only non-homicidal threats. 201 F.3d at 108. In rejecting a due process challenge, the court explained that "[t]he discrepancy as to the precise nature of the threatened harm did not represent a failure of specificity that would impair Kalwa-

sinski's ability to prepare his defense." *Id.* But *Kalwasinski*'s conclusion cannot be divorced from the facts of that case. The noted variance between charge and proof arose in the context of an otherwise detailed misbehavior report. Kalwasinski was given written notice that his charged conduct occurred on a specific (and correct) date: October 5, 1995; at a specific site: his jail cell; under specific circumstances: Kalwasinski disobeyed an order to remove a blanket obstructing the view of his cell. Further, the report advised Kalwasinski that, in defying the order, he engaged in two specific acts: he lewdly exposed himself to three corrections officers, while simultaneously directing threatening words and gestures toward them. The three officers were, moreover, identified by name and rank. *See id.* at 105.

Sira's situation is not at all comparable. His misbehavior report does not simply misidentify the incident date and time. It provides no notice as to the specific site or sites of his misconduct; it does not indicate the words or actions he employed in purportedly urging, organizing, or threatening inmates to participate in the Y2K strike; and it identifies no inmates toward whom his actions were directed. Thus, unlike *Kalwasinski,* this is not a case where one discrepancy in a misbehavior report can be excused because other details provided adequate notice of the conduct at issue. *See generally Quinones v. Ricks,* 288 A.D.2d 568, 568–69, 732 N.Y.S.2d 275, 276 (2d Dep't 2001) (noting that failure to include specific date in misbehavior report may be excused if the report otherwise provides sufficient details to permit the inmate to fashion a defense). From the notice he was given, Sira could only guess whether he was being charged with making a single objectionable statement to one inmate or a host of statements to groups of inmates; whether his conduct

allegedly occurred on a specific day in January or over the course of several weeks; and whether he had to defend against misconduct in the mess, the prison yard, his cell block, or some other location.

This is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct; but there must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense. *See Wolff v. McDonnell*, 418 U.S. at 564, 94 S.Ct. 2963; *Taylor v. Rodriguez*, 238 F.3d at 192–93. We recognize that, in some cases, prison officials may lack precise information about the date, place, and manner of an inmate's misconduct. In such circumstances, due process cannot demand that authorities provide notice of specific facts that are beyond their knowledge. But an inmate can at least be given any general information regarding the relevant time and place that is known to the authorities, accompanied by an explanation that the exact date or site of the alleged misconduct is unknown, or that the precise identities of persons toward whom the alleged act was directed are unknown. Such notice informs an inmate that he will not have to defend with respect to any particular date, place, or person, and permits him to focus his defense on challenging the sufficiency of the evidence. But where, as in this case, a defendant is provided with no specific facts relating to conclusory charges that he violated prison rules prohibiting inmates from urging or threatening others to cause prison disruptions, he has no more ability to identify the conduct at issue and to muster a defense than if he had been given no notice at all.

Defendants submit that any notice defects in the misbehavior report were ren-dered harmless by Lt. Schneider's January 31, 2000 testimony, which alerted Sira to statements made by confidential informants in the period from shortly before the December 24, 1999, lockdown through January 2000, identifying him as the leader of a group of Dominican inmates and the Captain of C–Block and reporting that Sira had used threats to enforce participation in the Y2K strike. Preliminarily, we are doubtful that inadequate written notice can be cured merely through oral disclosures at the disciplinary hearing. Certainly such curative disclosures would be insufficient unless the inmate was also afforded the meaningful opportunity to prepare a response to the new information. *See Wolff v. McDonnell*, 418 U.S. at 564, 94 S.Ct. 2963 (rejecting practice of giving inmates notice of charges at the time of disciplinary hearing and requiring 24–hour advance written notice). In any event, Lt. Schneider's testimony alerted Sira only to the role confidential informants ascribed to him within the inmate culture, not to the particular actions he allegedly took to encourage participation in the Y2K strike. The dates she mentioned referred to when confidential sources disclosed information to prison officials. Nothing in her testimony indicated whether Sira's actions were contemporaneous with those disclosures or whether they occurred weeks earlier. In sum, she provided no more specific facts than the initial misbehavior report with respect to when, where, or how Sira urged, organized, or threatened participation in the Y2K strike.

Accordingly, we conclude that when the record is viewed in the light most favorable to Sira, he has presented a viable due process claim of inadequate notice.

b. *Qualified Immunity*

 Defendants submit that even if Sira did not receive constitutionally ade-

quate notice of the disciplinary charges against him, they are, nevertheless, entitled to qualified immunity because under then-established law, reasonable corrections officials could have believed that the notice given comported with due process. We disagree.

As the preceding discussion makes plain, for more than two decades before the filing of Sira's misbehavior report, the law has recognized an inmate's due process right to receive advance written notice of the disciplinary charges against him sufficient to permit him "to marshal the facts in his defense." *Wolff v. McDonnell,* 418 U.S. at 564, 94 S.Ct. 2963. Opinions of this court, in reiterating the importance of adequate notice, have emphasized that vague, conclusory allegations are inadequate to this purpose; due process requires a modicum of factual specificity. *See Benitez v. Wolff,* 985 F.2d at 665 (observing that notice must " 'inform[ ] the inmate of what he allegedly has done so that he can prepare a defense, if he chooses, to the specific charges set forth' " (quoting *McKinnon v. Patterson,* 568 F.2d at 940 n. 11)).

Defendants acknowledge these precedents but argue that a reasonable corrections officer could have believed that a misbehavior report, like a criminal indict-

ment, satisfies due process if it simply tracks the language of the law or rule violated. This argument misstates the law with respect to indictments. We have frequently upheld indictments that "do little more than ... track the language of the statute charged," but only when they also state, at least approximately, "the time and place" of the alleged crime. *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir. 1975), *quoted in United States v. Walsh,* 194 F.3d 37, 44 (2d Cir.1999).[5] Crimes involving threats, moreover, are rarely charged in so bare-boned a manner. *See, e.g., United States v. Palmiotti,* 254 F.2d 491, 495 (2d Cir.1958) (rejecting generality challenge to extortion charge where indictment specified dates of threats, corporate victim, and specific amounts sought).[6] Indeed, we have not upheld indictments that merely tracked statutory language prohibiting threats when more specific pleading was necessary to permit the accused to prepare his defense and defend against double jeopardy. *See United States v. Davidoff,* 845 F.2d 1151, 1154 (2d Cir.1988) (reversing racketeering conviction where a defendant was not given notice of discrete extortion schemes that the prosecution intended to prove); *see also United States v. Tomasetta,* 429 F.2d 978, 980–81 (1st Cir. 1970) (finding indictment insufficient for

---

**5.** *United States v. Macklin,* 927 F.2d 1272 (2d Cir.1991), cited by defendants to support their argument, does not hold differently. In *Macklin*—a case decided after the Sentencing Guidelines but before the Supreme Court's decision in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and this court's decision in *United States v. Thomas,* 274 F.3d 655 (2d Cir.2001) (en banc)—the issue was whether a specific drug quantity had to be pleaded in connection with a phencyclidine conspiracy. In concluding that the omission did not render the indictment invalid, *see Macklin,* 927 F.2d at 1276, the court did not consider whether the pleading was otherwise sufficient to satisfy the notice requirement of due process. In any

event, we can presume that the conspiracy count, in addition to providing notice of the particular drug at issue in the charged criminal scheme, identified the relevant time frame of the conspiracy because the decision specifically references the need for such an allegation with respect to Title 21 conspiracies. *See id.*

**6.** In *Palmiotti,* the prosecution had further supplied particulars giving the names of the two corporate officers toward whom the threats were directed and the substance of those threats, but this court concluded that the indictment was sufficient even without those further details. *See id.*

failing to name the victim of an extortion count, the location of the alleged threat, and the means by which the threat was made); *cf.* *United States v. Kalevas,* 622 F.Supp. 1523, 1532 (S.D.N.Y.1985) (Weinfeld, J.) (rejecting request for particulars because government letter had already disclosed the names of the persons allegedly threatened by defendant and the approximate dates of those threats). Similarly, courts have not hesitated to order the government to give a defendant notice of the specific parts of a lengthy conversation on which it would rely to prove a threat charge. *See United States v. Sabri,* 973 F.Supp. 134, 138 (W.D.N.Y.1996).

In Sira's case, the misbehavior report provided no notice as to the purported victims of the charged misconduct, not even notice that the specific victims were unknown.[7] The report similarly failed to describe the words or actions by which defendant purportedly urged, organized, or threatened any person. As already noted, it did not provide even minimal notice of the time or place of the charged conduct. No reasonable officer could have thought that such a misbehavior report, devoid of any factual detail and containing an inaccurate incident date, was adequate to permit Sira to identify and marshal the facts pertinent to a defense. Indeed, such a conclusion is particularly warranted in this case because Sira persistently challenged the adequacy of the notice he received with respect to place, date, and victims. Capt. Morton acknowledged the

report's vagueness as to place and error as to date; Nevertheless, he refused to dismiss the report or to order that it be supplemented with some specific facts. Under these circumstances, we conclude that the district court correctly denied qualified immunity. *See Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

### 2. *Failure to Disclose Evidence Relied on to Support the Disciplinary Ruling*

Compounding the problem of inadequate notice, defendants also failed to disclose to Sira much of the evidence supporting his disciplinary ruling, specifically, the identities of the confidential informants who inculpated him in the Y2K strike and the substance of their statements.[8] An inmate's due process right to know the evidence upon which a discipline ruling is based is well established. *See Wolff v. McDonnell,* 418 U.S. at 564–65, 94 S.Ct. 2963; *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989). Such disclosure affords the inmate a reasonable opportunity to explain his actions and to alert officials to possible defects in the evidence.

■ Courts have long recognized, however, that the right to know evidence supporting prison disciplinary rulings is not absolute. *See Wolff v. McDonnell,* 418 U.S. at 564–65, 94 S.Ct. 2963. As the Supreme Court has observed, prison disci-

---

7. Because such notice would not have disclosed the identity of any informants, defendants cannot argue that they reasonably believed non-disclosure was necessary to protect the informants' safety. *See Giakoumelos v. Coughlin,* 88 F.3d 56, 62 (2d Cir.1996).

8. In rejecting defendants' qualified immunity claim, the district court assumed that Sira's non-disclosure point was subsumed within his sufficiency challenge and concluded that de-

fendants were not entitled to qualified immunity as to the latter. On appeal, defendants do not distinguish between these two aspects of Sira's due process claim. We are obliged to do so because, although we hold that qualified immunity bars Sira from suing defendants for disciplining him without sufficient evidence, *see infra* at [81–82], we conclude that the present record does not support a similar result with respect to the non-disclosure point.

plinary proceedings "take place in tightly controlled environments peopled by those who have been unable to conduct themselves properly in a free society." *Ponte v. Real*, 471 U.S. 491, 497, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). The risks of "violence or intimidation directed at either other inmates or staff" are real. *Id.* at 495, 105 S.Ct. 2192. Thus, when the disclosure of evidence presents such risks, hearing officers may properly decline to inform an inmate of the adverse evidence. *See Wolff v. McDonnell*, 418 U.S. at 565, 94 S.Ct. 2963; *Francis v. Coughlin*, 891 F.2d at 48.

■ Courts will not readily second guess the judgment of prison officials with respect to such matters, *see Wolff v. McDonnell*, 418 U.S. at 566, 94 S.Ct. 2963; nevertheless, the discretion to withhold evidence is not unreviewable, *see Ponte v. Real*, 471 U.S. at 498, 105 S.Ct. 2192. "The touchstone of due process," after all, "is freedom from arbitrary governmental action." *Id.* at 495, 105 S.Ct. 2192. Thus, prison officials who decide to circumscribe inmates' procedural rights at disciplinary proceedings must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action. *See id.* at 498–99, 105 S.Ct. 2192.

■ In this case, the sole contemporaneous reason stated by Capt. Morton to justify non-disclosure of the confidential evidence was as follows: "Inmate Sira was not present during the confidential testimony because it was confidential, and would have put another inmate's life in danger." Hearing Disposition Form at 2. Certainly, testimony adduced at the confidential hearing indicates that the informants' lives might have been placed at risk if they had appeared before Morton or if their identities had been disclosed to Sira. But neither Morton's statement nor any evidence in the present record suggests that disclosure of the *substance* of the

informants' statements to Sira would have presented safety risks.

For example, Informant 5's attribution of threatening conduct to Sira was conclusory, without any indication of the time, place or circumstances at issue; thus, it is not obvious from the record that its disclosure would have identified and, therefore, jeopardized the source. Similarly, although Informant 4's letter provided specific information as to strike leaders and a strike meeting site, it provided no context that identified the author. Informant 3 likewise reported only the overheard conversation of two other inmates, while Informant 2 disclosed information obtained simply from "asking around." The record provides us with no basis to conclude that Sira could have divined the informants' identities from disclosure of the substance of these hearsay reports.

Most significantly, nothing in the record explains why Sira could not have been informed of the substance of Informant 1's disclosure that at a strike meeting held in Building 12 sometime after the lockdown ended, inmate Codorel had identified Sira to a whole group of persons as the individual who would enforce the work action in C Block. Codorel's statement is significant because it is akin to a co-conspirator declaration and, if deemed credible, might, by itself, have supported Sira's discipline. *See infra* at [35] (discussing minimal requirement of "some reliable evidence" to support prison discipline). Withholding this information from Sira, however, deprived him of any opportunity to explain or challenge this inculpatory evidence, whether by demonstrating some motive for Codorel falsely to inculpate him in the strike, or by proffering a statement from Codorel himself denying the informant's report, or by adducing any other facts or circumstances relevant to reliability.

It is possible that on further development of the record defendants will be able to justify withholding the substance of the informants' disclosures from Sira. *See Ponte v. Real,* 471 U.S. at 498–99, 105 S.Ct. 2192. But because no reasons are now before the court and because we review the record in the light most favorable to Sira, we must conclude that he presents a viable due process claim based on nondisclosure of evidence and that there is no basis to hold that any reasonable officer could have thought otherwise. Accordingly, defendants are not entitled to qualified immunity on this part of Sira's due process claim.

### 3. *Insufficiency of the Evidence*

#### a. *The Due Process Violation*

In considering whether Sira presents a viable due process challenge to the sufficiency of the evidence, we address the following issues: (1) the evidence required by law to support prison discipline, (2) a hearing officer's obligation independently to assess the reliability of evidence supplied by confidential informants, and (3) the need to evaluate reliability by reference to the totality of circumstances. With respect to totality review, we further discuss how this applies to (a) hearsay evidence supplied by confidential informants and (b) conclusory assertions by informants.

#### (1) *The Requirement of "Some Reliable Evidence" to Support Prison Discipline*

In *Superintendent v. Hill,* the Supreme Court ruled that prison discipline decisions affecting an inmate's liberty interest cannot be "imposed arbitrarily" but must be "supported by some evidence in the record." 472 U.S. at 454, 105 S.Ct. 2768. Judicial review of this "some evidence" standard is narrowly focused. As the Supreme Court has explained, it "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* at 455–56, 105 S.Ct. 2768. However narrow this sufficiency question, it presents an issue of law subject to our plenary review. *Cf. United States v. Henry,* 325 F.3d 93, 103 (2d Cir.2003) (holding that sufficiency of the evidence supporting a criminal conviction is reviewed *de novo* ); *Machadio v. Apfel,* 276 F.3d 103, 108 (2d Cir.2002) (reviewing sufficiency of substantial evidence determinations *de novo* ); *Heard v. United States,* 348 F.2d 43, 44 (D.C.Cir.1964) (per curiam) (observing that "the question whether the evidence in a particular case constitutes 'some evidence' of insanity ... is a question of law for the court").[9]

In a recent discussion of the "some evidence" standard, this court observed that only "reliable" evidence can constitute "some evidence." *Luna v. Pico,* 356 F.3d at 488. The principle is not new. A reliability inquiry has long been required when confidential source information is relied on to satisfy the "some evi-

---

9. New York law requires prison disciplinary rulings to be supported by "sufficiently relevant and probative" information "to constitute substantial evidence." *Foster v. Coughlin,* 76 N.Y.2d 964, 966, 563 N.Y.S.2d 728, 729, 565 N.E.2d 477 (1990) (internal quotation marks omitted). This requirement is sterner than the "some evidence" standard necessary to afford due process. *See Superintendent v. Hill,* 472 U.S. at 449, 105 S.Ct. 2768; *id.* at 459 & n. 3, 105 S.Ct. 2768 (Stevens, J., concurring in part and dissenting in part). Director Selsky's reversal of Sira's disciplinary ruling therefore does not automatically establish Sira's federal claim.

dence" standard. As we explained in *Giakoumelos v. Coughlin*, "an informant's testimony" implicating an accused inmate in charged misconduct can support a some-evidence finding "as long as there has been 'some examination of indicia relevant to [an informant's] credibility.'" 88 F.3d at 61 (quoting *Russell v. Scully*, 15 F.3d 219, 223 (2d Cir.1993)); *accord Taylor v. Rodriguez*, 238 F.3d at 194.

(2) *The Need for an Independent Assessment of Informant Credibility to Determine Reliability*

In this case, all the evidence supporting the misconduct charge against Sira derived from confidential informants. There has been some ambiguity in our case law whether a hearing officer must make an independent assessment of informant credibility to ensure that disclosures qualify as some reliable evidence, or whether he can simply rely on the opinions of prison officials who have dealt with the informants. *See Gaston v. Coughlin*, 249 F.3d 156, 163 (2d Cir.2001) (describing question as "not yet resolved" in this circuit).[10] In *Gaston*, it was unnecessary to choose between the two standards because the record clearly demonstrated that the hearing officer had conducted a satisfactory independent assessment of informant credibility. *Id.* at 164.

We note, however, that in *Taylor v. Rodriguez*, 238 F.3d at 194, this court endorsed an independent credibility assessment when confidential information is used to establish the "some evidence" necessary to afford due process in prison disciplinary proceedings. The record in *Taylor* failed to evidence any credibility assessment, independent or otherwise, by the hearing officer; nevertheless, the court expressly discussed only the former standard in reversing an award of summary judgment in favor of prison authorities: "Requiring an independent credibility assessment ensures not only a fair hearing and discipline based on reliable evidence, but also places a minimal burden on prison officials conducting such hearings, with the assurance that judicial review is available." *Id.* Because this conclusion was instrumental to *Taylor*'s ruling, it binds us notwithstanding *Gaston*'s *dicta*. *See generally Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399–401, 5 L.Ed. 257 (1821); *United States v. Bell*, 524 F.2d 202, 205–06 (2d Cir.1975); 1 C. Wright & M. Kane, *The Law of Federal Courts* § 56, at 386 (6th ed. 2002) ("If the Court believes it is deliberately deciding a constitutional question, it is wise to suppose that the constitutional question has been decided, unless and until some later Court suggests a different answer.").

In any event, we think *Taylor*'s holding is constitutionally sound. Due process requires not simply that an inmate facing a loss of liberty receive a hearing, but that he receive a fair hearing. *See, e.g., Grillo v. Coughlin*, 31 F.3d 53, 56 (2d Cir.1994). *See generally Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 161, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) ("Fairness of procedure is due process in the primary sense."

---

**10.** In discussing the two standards in *Russell v. Scully*, 15 F.3d at 223, we explained that an independent assessment requirement would not place a heavy burden on hearing officers. It would not, for example, require direct examination of an informant. It requires nothing "more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility." *Id.* (contrasting questions asking prison officials if they believed the informants, which would elicit only the officials' opinions, with questions asking about the informants' record of reliability, which would elicit historical facts "that are indicia of the informants' credibility upon which a hearing officer might ... reasonably rel[y]").

(internal quotation marks omitted)). Fairness cannot be achieved without some assessment of the reliability of the evidence offered against the accused. In our adversarial system, confrontation and cross-examination are the usual tools used to test credibility. *See Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Cotto v. Herbert,* 331 F.3d 217, 248–49 (2d Cir.2003); *see also Crawford v. Washington,* — U.S. —, —, —, 124 S.Ct. 1354, 1359, 1370, 158 L.Ed.2d 177 (2004); *cf. United States v. Burr,* 25 F. Cas. 187, 193 (No. 14,694) (C.C.Va.1807) (Marshall, C.J.) (noting that nothing "endanger[s]" the right to "life, liberty and property" more than precluding confrontation). But in light of the substantial risks for violence and retaliation in connection with prison disciplinary actions, due process does not mandate these procedures in that context—although prison officials retain discretion to afford them. *See Wolff v. McDonnell,* 418 U.S. at 568, 94 S.Ct. 2963. Nevertheless, when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.

The record in this case demonstrates, and Sira does not dispute, that Capt. Morton independently assessed the credibility of these informants by inquiring as to their record for reliability. *See Russell v. Scully,* 15 F.3d at 223. In the case of Informants 1–3, however, the evidence supplied was not based on the informants' personal knowledge but on communications from third parties. Sira asserts that such information could not be deemed reliable without further inquiry into the credibility of the underlying sources. As to evidence supplied by Informant 4, because the record is unclear as to whether it was based on direct knowledge or hearsay, Sira submits that it could not be considered reliable without further similar inquiry. Finally, as to Informant 5, the only source who purported to provide direct evidence, Sira asserts that his information was too conclusory to be deemed reliable without some inquiry into its basis.

### (3) Totality Review of the Reliability of Confidential Evidence

#### (a) Hearsay Disclosures by Credible Informants

We agree that when confidential information presented at a prison disciplinary proceeding involves multiple levels of hearsay, a hearing officer cannot determine the reliability of that information simply by reference to the informant's past record for credibility. Credible informants may, after all, unwittingly pass along suspect information from unreliable sources. For this reason, the officer must consider the totality of the circumstances to determine if the hearsay information is, in fact, reliable.

Any number of factors may inform a totality assessment of reliability. *See Illinois v. Gates,* 462 U.S. 213, 233, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (holding that reliability assessments generally depend on the totality of circumstances). For example, a hearing officer may consider the identity and reputation of the original declarant, his motive for making the statements at issue, whether he is willing to testify and, if not, the reasons informing that decision, and the consequences he faces if his disclosures prove false. Where the original declarant's identity is unknown or not disclosed, the hearing officer may nevertheless consider such factors as the specificity of the information, the circumstances under which it was disclosed, and the degree to which it is corroborated by other evidence. *See Alabama v. White,*

496 U.S. 325, 330–31, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *United States v. Wagner*, 989 F.2d 69, 72–73 (2d Cir.1993). *See generally Chambers v. Mississippi*, 410 U.S. at 300–01, 93 S.Ct. 1038 (finding hearsay statements reliable because they were made spontaneously, were corroborated by some other evidence in the case, and were against the declarant's interest); *Dutton v. Evans*, 400 U.S. 74, 88–89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (further discussing factors relevant to reliability). The officer may also consider any challenges to reliability raised by the accused inmate. Where good reasons justify withholding confidential evidence from the inmate, the hearing officer, of course, has the singular responsibility for ensuring that he has been provided with all the facts and circumstances necessary to make an informed assessment of reliability.

■ In this case, where Sira appears to have been unjustifiably deprived of adequate notice and the substance of the evidence against him, Capt. Morton's failure to probe and assess the totality of the circumstances in assessing the reliability of third-party hearsay information disclosed by confidential informants makes it impossible for us to conclude as a matter of law at this stage of the case that Sira can present no viable sufficiency claim. While this is obviously the case with respect to the general accusations reported by Informants 2 and 4, the conclusion pertains even as to Informant 1. As we have already noted, his report that Codorel had announced to a group of striking inmates that Sira would enforce discipline in C–Block might have sufficed, by itself, to support Sira's discipline if the statement's reliability had been assessed in light of the totality of the circumstances. But Codorel's reliability could not be determined by reference *only* to the credibility record of Informant 1. It may be that on further

development of the record, Morton might satisfactorily demonstrate that he did base his reliability finding with respect to all the hearsay declarants on more than a credibility assessment of the informants, but on this appeal, we must assume otherwise and, therefore, conclude that plaintiff has stated a viable constitutional claim.

■ Defendants, however, submit that further factual development is unnecessary to their motion. They argue that the reliability of the hearsay evidence is so plainly established by the internal consistency of the information disclosed that Sira cannot, as a matter of law, establish that he was disciplined without some reliable evidence. In appropriate cases, consistency among hearsay statements may support a finding of reliability. *See United States v. Int'l Bhd. of Teamsters*, 998 F.2d 120, 124 (2d Cir.1993); *accord United States v. Int'l Bhd. of Teamsters*, 315 F.3d 97, 100 n. 3 (2d Cir.2002). But such a finding is not compelled as a matter of law in every case, and certainly not in this one.

For example, defendants highlight that several declarants placed Sira in Building 12 at night and in the pre-release center in the morning. At oral argument, however, Sira's counsel explained that his client was assigned to these locations. Presumably, Sira himself could have made this point at the discipline hearing had he known the substance of the confidential evidence. Corroboration of facts generally known or easily obtained do not necessarily establish a source's reliability with respect to other incriminating matters. *See Alabama v. White*, 496 U.S. at 332, 110 S.Ct. 2412; *see also United States v. Mendonsa*, 989 F.2d 366, 369 (9th Cir.1993) ("mere confirmation of innocent static details is insufficient to support an anonymous tip"); *United States v. Rasor*, 599 F.2d 1330, 1332 (5th Cir.1979) (holding that corroboration of information that "was readily available to

many persons" does not demonstrate reliability). The consistency among the declarants on this point therefore bears little, if any, weight on a motion for summary judgment.

The more significant consistency among certain of the hearsay statements is the description of Sira as a person responsible for enforcing strike participation. The statements, however, also bear certain inconsistencies—for example, some of the declarants reported that Sira enforced C–Block (where he was housed), while others said J–Block (where he apparently worked). Further, except in the case of declarant Codorel, the statements reveal almost nothing about the circumstances under which they were made. On this record, we cannot conclude as a matter of law that Capt. Morton necessarily found that the consistencies in the hearsay established their reliability. Nothing in the record indicates that he considered the issue, nor any other circumstances relevant to the reliability of the hearsay accounts other than the confidential informants' credibility records. As we have already stated, this last factor is insufficient, by itself, to establish the reliability of the hearsay information communicated by Informants 1–4.

### (b) Conclusory Assertions by Credible Informants

■ One source, Informant 5, provided direct evidence, reporting that he saw Sira "coerce inmates through strong arm tactics and threats of violence to participate in certain stages of the planned strike." Hearing Tr., Feb. 8, 2000, at 5. We agree with the district judge that this conclusory characterization of Sira's con-

duct—unsupported by any factual basis as to what the informant heard or saw that he considered threatening, when or where he made his observations, or the persons toward whom Sira directed his purported threats—cannot, by itself, qualify as some reliable evidence of inmate misconduct. As the Supreme Court has long cautioned, a conclusory statement of culpability provides "virtually no basis at all" for a reviewing officer to make a reasoned and independent judgment on the matter at issue. *Illinois v. Gates*, 462 U.S. at 239, 103 S.Ct. 2317. Due process does not permit a hearing officer simply to ratify the bald conclusions of others; it requires some inquiry to determine whether the totality of facts and circumstances reasonably supports the proffered conclusion. Indeed, this obligation pertains even when the conclusion is that of an eyewitness or person of general reliability. *See id.* at 234 & n. 8, 103 S.Ct. 2317; *see also Zavaro v. Coughlin*, 970 F.2d 1148, 1152–53 (2d Cir.1992) (holding that testimony from prison officials that "every inmate" of the more than one hundred in the mess hall at a particular time participated in a riot was too conclusory and speculative to constitute reliable evidence).

The factual basis for a witness's conclusions is certainly a relevant factor among the totality of circumstances properly considered in assessing reliability. *See Illinois v. Gates*, 462 U.S. at 239, 103 S.Ct. 2317; *Caldarola v. Calabrese*, 298 F.3d 156, 162–63 (2d Cir.2002). While a thorough articulation of the factual basis for particular information may not be necessary in every case, especially where other circumstances weigh heavily in favor of reliability,[11] in this case the record is de-

---

11. For example, the fact that "a particular informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality" might excuse the

"failure, in a particular case, to thoroughly set forth the basis of his knowledge." *Illinois v. Gates*, 462 U.S. at 233, 103 S.Ct. 2317. That, however, is not this case. The

void of any inquiry into the basis for Informant 5's conclusory disclosure. The officer who dealt directly with Informant 5 testified to no facts or circumstances supporting the source's conclusion, and the hearing officer did not request that the officer question the informant further to ascertain such underlying information.

The record suggests that Capt. Morton may have recognized a reliability problem with respect to Informant 5's conclusory statement and, rather than pursue any inquiry into the totality of the circumstances, chose simply to ignore the evidence. He did not, after all, find Sira guilty of the threat charge, which he presumably would have done had he concluded that Informant 5's statement was reliable. If, indeed, Morton rejected or ignored Informant 5's conclusory statement—as a view of the evidence most favorable to Sira would suggest—we cannot assume that it was used to corroborate the third-party hearsay declarations whose own reliability, on the record before us, appears not to have been adequately assessed.

In sum, if we view the record in the light most favorable to Sira, we must conclude that he has presented a viable due process claim that defendants ordered him disciplined without some reliable evidence of misconduct.

b. *Qualified Immunity*

Defendants maintain that even if Sira's disciplinary ruling was based on insufficient reliable evidence to satisfy due process, they are entitled to qualified immunity.

As we have already noted, qualified immunity shields a government official from

suit if his challenged conduct was objectively reasonable in light of legal rules that were "clearly established" at the time of his actions. *See Saucier v. Katz*, 533 U.S. at 201–02, 121 S.Ct. 2151; *Luna v. Pico*, 356 F.3d at 490. To be clearly established, a right must have been recognized in a particularized rather than a general sense. In other words, it is not enough that a general right to due process is clearly established by the Constitution. The "contours" of that right, as they pertain to a particular issue—for example, the identification of what qualifies as some reliable evidence in prison disciplinary proceedings—must have been delineated with sufficient clarity "that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). This is because "[t]he qualified immunity standard 'gives ample room for mistaken judgments,'" protecting "'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

■ Applying these principles to this case, we conclude that defendants are entitled to qualified immunity with respect to Sira's sufficiency challenge. As this court recently observed, neither this circuit nor the Supreme Court has clearly defined standards for determining what constitutes "some evidence" in the context of prison disciplinary hearings; rather, decisions have addressed the problem piecemeal, focusing on the discrete problems raised by the facts of particular cases. *See, e.g., Luna v. Pico*, 356 F.3d at 491 (holding that due process requires a credibility assess-

---

record indicates that Informant 5 had previously provided reliable information under unspecified circumstances; nothing indicates

"unusual reliability" in his ability to reach conclusions about inmates' participation in the Y2K strike.

ment of victim's hearsay accusation, but granting qualified immunity dismissal).

At the time of Sira's disciplinary proceedings, the law of this circuit recognized a due process obligation to conduct some assessment of informant credibility to support prison discipline, *see Giakoumelos v. Coughlin*, 88 F.3d at 61; *Russell v. Scully*, 15 F.3d at 223, but there was an ambiguity—which persisted at least until this court's decision in *Taylor v. Rodriguez*, 238 F.3d at 192–93, and possibly thereafter, *see Gaston v. Coughlin*, 249 F.3d at 163—as to whether a hearing officer was required to conduct an independent assessment or whether he could rely on the opinion of another person. We have attempted to clarify that point today by reiterating *Taylor*'s recognition that due process requires an independent assessment of the confidential informant's credibility.

Further, no prior case appears to have addressed the issue whether an independent assessment of informant credibility is necessarily sufficient to establish the reliability of all confidential disclosures, including third-party hearsay. Indeed, in cases where confidential information was found to constitute some reliable evidence, our decisions did not specifically discuss whether the evidence was based on the informant's direct knowledge or on hearsay. *See, e.g., Gaston v. Coughlin*, 249 F.3d at 160–61, 163 (holding that confidential information that inmate had prepared directions for mess hall slowdown on a piece of paper and passed it out to other inmates constituted the "some evidence" required by due process). We today hold that the reliability of evidence is always properly assessed by reference to the totality of the circumstances and that an informant's record for reliability cannot, by itself, establish the reliability of bald conclusions or third-party hearsay.

Because this principle was not clearly established before today, it was objectively reasonable for defendants to think that an independent assessment of the credibility of the confidential informants who proffered evidence against Sira, consistent with *Russell v. Scully*, 15 F.3d at 223, satisfied due process, and that Capt. Morton could, without further inquiry, rely on the third-party hearsay disclosed by those informants as some reliable evidence of Sira's participation in the Y2K strike. Accordingly, although we agree with the district court that the present record supports Sira's sufficiency challenge, we reverse the denial of qualified immunity on this part of Sira's due process claim and direct that, on remand, summary judgment be entered in favor of defendants on this point.

CONCLUSION

To summarize, we conclude that the district court properly converted defendants' motion on the pleadings into a motion for summary judgment, and that defendants were not prejudiced by this conversion. Furthermore, we conclude that defendants have not established their right to qualified immunity as to Sira's due process claims of inadequate notice of the charges and disclosure of the evidence. We therefore affirm the district court order denying summary judgment on these matters. With respect to Sira's due process challenge to the sufficiency of the evidence, we hold that a hearing officer must consider the totality of the circumstances in assessing whether information supplied by confidential sources constitutes some reliable evidence of inmate misconduct supporting discipline affecting liberty interests. Nevertheless, we conclude that the law had not clearly established the need to look beyond the credibility records of confidential informants when evaluating the reliability of conclusions or third-party hearsay evi-

dence supplied by them. Accordingly, the defendants are entitled to qualified immunity on this part of Sira's due process claim. We REVERSE the district court's order to the extent it is to the contrary and REMAND for further proceedings consistent with this opinion.