*Elder v. McCarthy*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2018

(Argued: November 28, 2018    Decided: July 23, 2020)

Docket No. 17-2230

JARVIS ELDER,

*Plaintiff-Appellant,*

–v.–

J. MCCARTHY, SERGEANT; T. MACINTYRE, CORRECTIONAL OFFICER; KEN.
KLING, HEARING OFFICER/VOC. SUPRV.; ALBERT PRACK, DIRECTOR OF SPECIAL
HOUSING; MARK L. BRADT, SUPERINTENDENT,

*Defendants-Appellees.*

B e f o r e :

KEARSE, LIVINGSTON, and CARNEY, *Circuit Judges.*

While incarcerated at Attica Correctional Facility, Plaintiff-Appellant Jarvis Elder was accused of forging inmate account disbursement forms to steal funds from another inmate's account. After a disciplinary hearing, a prison official found him guilty of the charged offense and sentenced him to serve six months in Attica's special housing unit ("SHU"). Elder successfully challenged the prison's finding in an Article 78 proceeding

in New York State court on grounds (among others) that the determination was not supported by substantial evidence and that he did not receive meaningful assistance in defending against the charges. This led to annulment of the determination and expungement of his disciplinary record of theft. *Elder v. Fischer*, 115 A.D. 3d 1177 (4th Dep't 2014). Elder then sued prison officials under 42 U.S.C. § 1983, claiming violations of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. The United States District Court for the Western District of New York (Siragusa, *J.*) dismissed the Eighth Amendment claim with prejudice at the pleading stage and then awarded summary judgment to Defendants on Elder's due process claims, concluding that Elder received all the process he was due. Elder now appeals. We conclude that Elder received adequate notice as to the charges against him. Elder's disciplinary conviction was not sufficiently supported by the evidence, however. The disciplinary proceedings were tainted by procedural lapses that violated Elder's due process rights. In particular, among other due process concerns, Defendant prison officers failed to consult readily available prison records to identify the officers with relevant information, limiting his ability to defend against the charges. In addition, we decide that the district court exceeded the permissible bounds of its discretion in dismissing Elder's Eighth Amendment claim without providing him a meaningful opportunity to seek leave to amend his complaint.

AFFIRMED IN PART, REVERSED IN PART, AND VACATED AND REMANDED IN PART.

————————

FABIEN M. THAYAMBALLI (Alexandra A.E. Shapiro, *on the brief*), Shapiro Arato LLP, New York, NY, *for Plaintiff-Appellant*.

PATRICK A. WOODS (Victor Paladino & Jeffrey W. Lang, *on the brief, for* Barbara D. Underwood, Attorney General, State of New York), Office of the New York State Attorney General, Albany, NY, *for Defendants-Appellees*.

————————

CARNEY, *Circuit Judge*:

In 2012, while incarcerated at Attica Correctional Facility in upstate New York, Plaintiff-Appellant Jarvis Elder was accused of forging inmate account disbursement

forms to steal funds from another inmate's account. After a disciplinary hearing, a prison official found Elder guilty of the related charges and sentenced him to serve six months in Attica's punitive special housing unit ("SHU"), confined to a cell with one other person for twenty-three hours a day. Elder successfully challenged the disciplinary decision in state court Article 78 proceedings, obtaining an annulment of the prison's disciplinary determination and expungement of the record of his disciplinary infraction. *Elder v. Fischer*, 115 A.D. 3d 1177 (4th Dep't 2014). By the time that decision issued, however, Elder had already served his full six-month sentence in the SHU.

Elder then brought claims against state officials under 42 U.S.C. § 1983 in the United States District Court for the Western District of New York (Siragusa, *J.*). Seeking damages and attorneys' fees for Eighth Amendment and due process violations, Elder sued four Attica employees (the "Attica Defendants")—John McCarthy, a corrections sergeant; Trevor MacIntyre, a corrections officer; Ken Kling, a vocational supervisor and the hearing officer on Elder's case; Mark Bradt, the Superintendent—and Albert Prack, the Director of Special Housing/Inmate Disciplinary Programs in the New York State Department of Corrections and Community Supervision ("DOCCS") (the "State Defendant"; together with the Attica Defendants, "Defendants").

The district court dismissed Elder's Eighth Amendment claim at the pleading stage without allowing Elder (who was then proceeding pro se) an opportunity to seek leave to amend. The court later granted summary judgment to Defendants on Elder's due process claims, concluding that prison officials had given Elder all the process he was constitutionally due. Elder now appeals the district court's final judgment.

Elder urges that the record on summary judgment establishes that prison officials wrongly deprived him of his right to due process by denying him the ability to call witnesses, to receive adequate assistance in preparing his defense, to receive fair

notice of the charges, and to be disciplined only upon a showing of "some reliable evidence" of guilt, *see Sira v. Morton*, 380 F.3d 57, 81 (2d Cir. 2004). He contends that the district court erred in ruling otherwise. As to his Eighth Amendment claim that he suffered cruel and unusual punishment, Elder submits that he was entitled to an opportunity to cure the defects that the district court identified in his complaint—and that he could cure them.

On de novo review of both the summary judgment and motion to dismiss decisions, we conclude that the district court correctly dismissed Elder's due process claim that rested on a theory of inadequate notice. Accordingly, we AFFIRM the district court's judgment as to this claim. We sustain, however, Elder's due process claims pertaining to the sufficiency of evidence and access to witnesses, and therefore REVERSE the summary judgment awarded by the district court to Defendants on this count and REMAND with directions that summary judgment be entered in Elder's favor. As to his due process claim arising from the adequacy of the assistance he received, we VACATE the judgment and REMAND the cause for trial. And finally, as to Elder's Eighth Amendment claim, we also VACATE the judgment entered in Defendants' favor on their motion to dismiss and REMAND the cause with instructions that Elder be allowed to file an amended complaint and that further proceedings be conducted consistent with this Opinion.

## BACKGROUND

### I.     Factual background

The following account is drawn from the record before the district court when it adjudicated defendants' motion for summary judgment. The facts as described here are not disputed by the parties except as otherwise noted. We look only to Elder's

complaint, however, when reviewing the district court's Rule 12(b)(6) dismissal of Elder's Eighth Amendment claim. *See infra*, Part VI.

A.     <u>The fire, the investigation, and the misbehavior report</u>

Jarvis Elder was incarcerated at Attica Correctional Facility in 2009, after his New York conviction for burglary. On September 1, 2012, while he was out of his cell for his afternoon meal, a fire was set in his cell, destroying many of his personal effects. Prison officials undertook to investigate the cause of the fire, placing Elder on "keep lock" (that is, confined in another cell and not permitted to travel outside his cell without physical restraints, *see Murray v. McGinnis*, 63 F. App'x 562, 563 (2d Cir. 2003)) in the meantime.

On September 4, Corrections Sergeant John McCarthy learned (from whom is not clear) that Elder's cell had been set aflame and received "reliable confidential information" (in his later words) that another inmate, Reginald Lawrence, was involved in "possible drug activity as well as the arson of Inmate Elder's cell." App'x 297. McCarthy then searched Lawrence's cell. There, he found a list of addresses, a list of phone numbers, and an inmate account disbursement form that had been completed in Elder's name. McCarthy then turned to interviewing Elder, who claimed ownership of the three items that turned up in Lawrence's cell. Elder also told McCarthy that he (Elder) had filled out the disbursement form and had done so in connection with a withdrawal from his own account.

On September 10, McCarthy filed his investigation report. It chronicled the September 4 start of his investigative effort—not with regard to the arson, but with regard to the source of possibly forged disbursement forms, which the prison had relied on to pay out $630 in withdrawals from Lawrence's account. To execute a withdrawal from an inmate account, the inmate who holds the account submits a completed, signed disbursement form to a designated officer. The officer then verifies the inmate's name

5

and identification number and countersigns the form to authorize the disbursement, which in this case was generally made by check made payable to the inmate or the inmate's payee.

McCarthy concluded that the handwriting that appeared on the disbursement form found in Lawrence's cell and claimed by Elder as his own matched that appearing on the seven suspect disbursement forms completed in Lawrence's name (the latter forms, the "Lawrence forms" or the "Lawrence disbursement forms"). McCarthy wrote that he believed Elder had forged the Lawrence forms, stating that "the handwriting on Inmate Elder's personal 2706 form matches all of the 2706 forms with Inmate Lawrence's name and number on it . . . therefore, it is my belief that Inmate Elder forged all the 2706 forms . . . ." App'x 298.

Elder received a copy of McCarthy's report on September 11. He remained in keep lock until September 14, when his disciplinary hearing began. So confined, Elder was unable to investigate the charges on his own behalf. In these circumstances, DOCCS regulations entitled Elder to receive a prison officer's assistance in investigating the charge and preparing his defense to the disciplinary proceedings. *See* 7 N.Y.C.R.R. 251-4.1(a)(4). These regulations provide that the assistant's role is "to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate." *Id.* 251-4.2. An inmate may request that an assistant "obtain[] documentary evidence or written statements which may be necessary." *Id.* Elder identified three possible assistants from a list provided him. He was assigned Defendant Trevor MacIntyre.

On September 13, MacIntyre visited Elder in his keep lock cell to discuss what assistance Elder needed. They agree that, in that conversation, Elder denied the forgery and theft charges brought against him, but otherwise, their accounts differ. According

6

to Elder, he asked McIntyre to collect documents, interview certain witnesses, and arrange for those witnesses to be present at his disciplinary hearing. He further requested that MacIntyre provide him copies of the Lawrence disbursement forms at issue, as well as of "Chapter V," as the DOCCS regulations governing disciplinary proceedings are known. Elder also avers that he asked MacIntyre to conduct several interviews: first, of McCarthy, the author of the investigative report; second, of prisonmate Reginald Lawrence; third, of a handwriting expert; and fourth, of the officers who countersigned the Lawrence disbursement forms—the forms that Elder was accused of forging.

On a prison "Assistant Form" dated September 13 (the day he interviewed Elder), however, MacIntyre recorded only that Elder requested that Lawrence be interviewed; that McCarthy be present at the hearing; a handwriting specialist; the "directive on forgery"; and that the "officers who signed the disbursement forms be present at the hearing." App'x 43. In particular, MacIntyre maintains that Elder did not request copies of the Lawrence disbursement forms themselves or of Chapter V. He asserts further that, although Elder asked that the officers who countersigned the forms be made available for questioning at the hearing, Elder did not ask MacIntyre to interview them in advance. Elder countersigned the assistant form that McIntyre prepared, apparently when their meeting ended, at approximately 1 pm on September 13. *Id.*

After meeting with Elder, MacIntyre interviewed Lawrence. MacIntyre later reported to Elder that Lawrence refused to testify, and that refusal, too, is noted on the Assistant Form. Next, according to MacIntyre, he searched for a "directive on forgery" and determined that one did not exist, recording that information on the Assistant Form. App'x 300. MacIntyre also said that he relayed Elder's requests for witnesses, including his specific request that the officers who countersigned the Lawrence

7

disbursement forms appear at his hearing. Elder disputes MacIntyre's account: he testified during his deposition that MacIntyre told him that he would have to wait until the hearing to see the documents he had requested and that Elder would have to wait until the hearing to receive further assistance.

B. The disciplinary hearing and disposition

The disciplinary hearing began on September 14, with Defendant Ken Kling, a vocational supervisor, presiding. Kling opened the hearing by reviewing the list of witnesses Elder had requested appear, including Lawrence and the still-unidentified officers who signed the Lawrence disbursement forms. Kling explained that he could not compel Lawrence to testify; that McCarthy was not available to attend the hearing that day; and that Kling needed more information to enable him to identify the countersigning officer witnesses. Kling then read McCarthy's report into the record. Elder pleaded not guilty to the charges brought: forgery and theft. (MacIntyre, Elder's assistant, apparently did not attend the hearing.)

The hearing transcript reflects that Kling showed the Lawrence disbursement forms in some way, stating, "that is the written evidence that I am showing you." App'x 318. Elder disputes that he was able to meaningfully review this evidence: he later testified that Kling "flipp[ed] through" the forms and displayed them to him from where Kling was seated, but that Kling did not "plac[e] them in [his] hand and let [him] look at [them]." App'x 266.

Elder explained to Kling that identifying the officers who had signed the disbursement forms was crucial to his defense because "they have to check ID," implying that they should be able to identify who signed or submitted the Lawrence forms and could potentially exonerate Elder. App'x 318. Kling responded that he understood and that he would "see what [he could] do," App'x 319, but that he could

not read the officers' scrawled signatures. Elder complained that he had never received copies of the written evidence and thus lacked specific information about the accusations against him, including any relevant "dates and times." *Id*. Kling then adjourned the hearing.

The hearing reconvened a week later, on September 21. Kling reviewed the charges and Elder's "not guilty" plea with him before inviting Elder to make a statement. App'x 319. Elder accepted the invitation. He denied stealing anything from Lawrence and denied forging the disbursement forms. He argued that he could not have forged the forms because "it is a policy . . . [to] check inmates['] name and ID number prior to . . . taking disbursement forms." App'x 320. Elder explained that he and Lawrence knew each other, and that he had previously "helped [Lawrence] out" with matters concerning money and artwork or art supplies. App'x 319. Elder stated that he was concerned that Lawrence had somehow ended up with Elder's address and phone lists and suggested that Lawrence might have framed him and "pull[ed] a scam to get money." App'x 320.

Kling called McCarthy as a witness. He first asked McCarthy "what [led him] to believe that Inmate Elder was the person who committed [the] forgery." App'x 321. McCarthy responded that, when he searched Lawrence's cell on or about September 4, he found documents bearing Elder's handwriting and that (in his view) the handwriting on those documents resembled that appearing on the purportedly forged forms. Kling inquired whether McCarthy could identify the officers who had approved and signed the disbursement forms. McCarthy replied that he could not. Kling added that he himself had asked about the identity of the signatory officers "in the block with different officers," but had no success. App'x 322.

9

After McCarthy testified and Elder had an opportunity to have cross-examination questions put to him, Kling closed the hearing and prepared a brief written disposition, which he read into the record a few minutes later. In the written disposition, Kling stated that he found Elder guilty of both forgery and stealing. He imposed a penalty on Elder of six months' confinement in the SHU, accompanied by loss of recreation, package receipt, and commissary privileges. He also ordered that Elder pay Lawrence $630 in restitution. Describing the evidence on which he relied, Kling wrote in toto:

> In this case I relied upon the verbal testimony given by Sgt. McCarthy in addition to the written misbehavior report. The visual evidence of the signature was compelling in the similarities. It would appear to me that some officers may have been lax in verifying I.D. I also felt that no credible defense was given.

App'x 329.

In an affidavit later submitted in the district court proceedings, Kling expanded on this description, and swore that the hearing record on which he relied included several additional documents: the purportedly forged Lawrence disbursement forms themselves; Elder's own disbursement form, found in Lawrence's cell; Elder's address and phone lists; Elder's mail receipts; and a check endorsed by Elder. The three Lawrence disbursement forms bore handwritten designations of "Reginald Lawerence [*sic*],"as payor. All were initialed or countersigned by unidentified corrections officers and all were paid out in the roughly three-week period from July 31 through August 24, 2012.

C.     Administrative appeals and Article 78 proceeding

In accordance with prison protocol, Elder appealed Kling's decision to Defendant Mark Bradt, Attica's Superintendent, and separately to Albert Prack, state-wide DOCCS

Director of Special Housing/Inmate Disciplinary Programs. Both Prack and Bradt affirmed Kling's decision.

Elder, acting pro se, then challenged the evidentiary sufficiency of Kling's decision in an Article 78 proceeding in New York Supreme Court. Eventually, the Appellate Division vindicated Elder's claim, ruling that the prison's disciplinary decision was not supported by substantial evidence. *See Elder*, 115 A.D.3d at 1177. The court's decision rested in part on the observation that the misbehavior report and evidence presented at the hearing included no statement "that [McCarthy] showed [Lawrence] the disbursement forms or that [Lawrence] claimed that it was not his signature on the forms." *Id.* at 1178. The court also criticized Kling for his failure, apart from speaking to a few unidentified "officers in the block," to make meaningful efforts to identify the officers who signed the Lawrence disbursement forms and whom Elder had requested attend the hearing. *Id*. The court further found that Elder "was denied meaningful employee assistance and was prejudiced by the inadequate assistance he received," pointing to the absence of evidence that MacIntyre made any efforts "to ascertain the names of the correction officers who signed the disbursement forms" or "to secure their presence at the hearing." *Id.* Thus, the court concluded, "it [could not] be said that reasonable efforts were made to locate [Elder's] witnesses." *Id.* (internal quotation marks omitted). On this basis, the court annulled Kling's decision and ordered that references to the matter be expunged from Elder's record. *Id.* at 1177. In 2014, when the Appellate Division's decision issued, however, Elder had long since completed his six-month sentence in the SHU.

## II.     District court proceedings

On May 1, 2014, Elder filed this action pro se under 42 U.S.C. § 1983, naming McCarthy, MacIntyre, Kling, Bradt, and Prack as defendants. Asserting Eighth and

Fourteenth Amendment violations by the state officials, he sought compensatory and punitive damages and attorneys' fees.

As relevant to this appeal, the operative complaint alleged that the prison's disciplinary proceedings violated his due process rights in several ways. Elder charged that (1) Sergeant McCarthy filed a false misbehavior report; (2) Officer MacIntyre provided inadequate assistance by failing to interview the witnesses and procure the documents that Elder requested; (3) Sergeant McCarthy and Hearing Officer Kling gave him inadequate notice of the charges against him because the misbehavior report lacked specificity and he did not have an adequate opportunity to review the Lawrence disbursement forms; (4) Hearing Officer Kling failed to provide Elder the documents Elder sought and did not call the officer witnesses he requested; (5) Hearing Officer Kling's disposition of the charges against Elder was not based on adequate or reliable evidence; and (6) in the administrative appeals process, Superintendent Bradt and Director Prack culpably failed to correct these unconstitutional procedural failures.

With respect to his Eighth Amendment claim that he was subjected to cruel and unusual punishment, Elder alleged that, while in the SHU, he was confined in a cell with one other person for twenty-three hours a day, allowed to exercise very little, and that he received "barely any cleaning supplies," which made "keeping the cell clean difficult and almost impossible." App'x 30-31, ¶¶ 39-40. He stated that he was allowed to shower only two to three times a week and had to step in and out of the shower to allow any privacy while his cellmate defecated nearby. He further alleged that he was seriously deprived of sleep while in the SHU because the lights in his cell were never turned off. As a result of these conditions, he alleged, he suffered from severe anxiety and depression.

12

In response to Elder's discovery requests, Defendants produced the logbook for A Block—the cell block in Attica where Elder and Lawrence lived—and staffing charts for the dates shown on the Lawrence disbursement forms. The staffing charts list the officers assigned to each post for each shift; the logbook records daily activity in the A Block and lists the officers who were present for each shift.[1]

Some evidence produced by Defendants cast doubt on Elder's guilt of the charges against him. In particular, in an August 2012 letter to a corrections officer, Inmate Accounts employee Ann Lopez voiced suspicions that Lawrence's complaint about unauthorized withdrawals was a fraud. She wrote, "I think this inmate [Lawrence] may be trying to scam us," and explained that she had returned two of the purportedly forged disbursement forms to Lawrence, telling him that they had been improperly submitted in a single envelope two to three weeks before the date of her letter, and said that "[h]e didn't question it then." App'x 359. And although "[t]he disbursement[] [forms] he claims tipped him off" showed an incomplete address, Lawrence listed his complete address in his written complaint about fraudulent withdrawals that he submitted to prison authorities. *Id.* In addition, Defendants produced contemporaneous letters from Lawrence to Elder's girlfriend, confessing Lawrence's romantic interest in her and urging her to leave Elder for him. In one of those letters, Lawrence recounted that Elder "got caught sneaking" money from Lawrence's account, and said that Lawrence had "dealt with" Elder and "look[ed] out for" Elder because Elder was "broke." App'x 376.

---

[1] As we discuss further below, the parties now dispute whether this information, if timely produced, could have enabled Kling to call as witnesses at the disciplinary hearing those individuals who initialed the Lawrence forms.

Some evidence produced by Defendants during these proceedings cut sharply against Elder, however. In particular, one check written on Lawrence's account was endorsed by two individuals: Chris Brinson (the payee listed on the Lawrence disbursement forms), and a certain Winifred Pike. Elder acknowledged at his deposition that Winifred Pike was his mother and that he knew "a few Chris Brinsons." App'x 261, 269.

By Decision and Order dated September 9, 2015, the district court dismissed Elder's Eighth Amendment claim under Rule 12(b)(6). Without reaching the question whether the complaint's allegations of unsanitary conditions were a sufficient basis for an Eighth Amendment claim and affording no opportunity to amend in response to the ruling, the court determined that the complaint failed to include "plausible allegations that any Defendant had the required knowledge of, and deliberate indifference to, his particular living conditions." *Elder v. McCarthy*, No. 14-CV-6216, 2015 WL 5254290, at *8 (W.D.N.Y. Sept. 9, 2015).

On June 23, 2017, the district court issued a final order denying Elder's summary judgment motion on the due process counts, granting Defendants' cross-motion, and dismissing the lawsuit based on the court's conclusion that no material facts were subject to genuine dispute and that no Defendant had violated Elder's due process rights. The court interpreted Elder's inadequate notice claim as faulting McCarthy's misbehavior report for its failure to "comply with procedural requirements imposed by New York State regulations." *Elder v. McCarthy*, No. 14-CV-6216, 2017 WL 2720007, at *7 n.24 (W.D.N.Y. June 23, 2017). Having done so, the court held that a "violation of such procedures does not amount to a federal due process violation." *Id.* As to Elder's inadequate assistance claim, the court acknowledged that MacIntyre "admittedly did very little for [Elder]" as Elder's assistant, but concluded nonetheless that "no constitutional violation occurred," either because the witnesses and documents Elder

14

had asked for were "unavailable," or because any shortcoming was harmless error. *Id.* at *10. As to his claims against Hearing Officer Kling, the court concluded that the disciplinary decision was  supported by "reliable evidence"; that Kling's failure to consult the prison records to identify the officers who had signed the disbursement forms did not violate due process; and that due process did not require Kling to give Elder copies of the disbursement forms, and in any event, any error in that regard, too, was harmless. *Id.* at *10-12.

Relying on these determinations, the district court also dismissed the claims against the remaining Defendants. The court dismissed Elder's claim against McCarthy for filing a false misbehavior report, reasoning that at his disciplinary hearing Elder received all the process he was due whether the report was false or not. Finally, the court dismissed the claims against Bradt and Prack as derivative of the position that the disciplinary proceedings against Elder were tainted by due process violations—a position that the court had rejected as to the other Defendants.

## DISCUSSION

We review de novo an order granting summary judgment under Rule 56, construing all record evidence in the light most favorable to the non-moving party. *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015). We will affirm the grant of summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We also review de novo the district court's grant of a motion to dismiss under Rule 12(b)(6). *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 467 (2d Cir. 2019).

For the reasons set forth below, we conclude that the substance of Kling's disciplinary determination regarding Elder was not supported by "some reliable evidence," under the standard that we established in *Sira* , 380 F.3d at 81, as needed to

15

satisfy constitutional due process requirements. Although we conclude that defendants gave Elder adequate notice of the charges against him, certain other procedural lapses identified by Elder run afoul of established law on due process claims that arise in the context of prisoner disciplinary proceedings. In particular, Defendants failed to consult readily available prison records to identify the officers who, critically, approved the allegedly forged disbursement forms and whom Elder requested be called as witnesses. Even if curing these flaws might not have exonerated Elder—and we cannot be sure that it would—these elements were essential to providing Elder the process he was due. In addition, the district court exceeded the bounds of its permissible discretion by dismissing Elder's Eighth Amendment claim without providing him a meaningful opportunity to amend his complaint. Accordingly, and as further explained below, we vacate the district court's judgment in part and remand for further proceedings consistent with this Opinion.

## I.      Kling's failure to produce witnesses

Elder asserts that the hearing officer, Kenneth Kling, denied him due process by failing to make reasonable efforts to identify the witnesses Elder sought to call. Elder highlights Kling's failure to consult the A-Block logbook[2] and facility staffing charts to identify the officers who were on duty when one or more of them approved the Lawrence disbursement forms. The district court rejected this claim, reasoning that although Elder contends that Kling "should have gone further, and examined the facility log books, his failure to do so did not violate due process." *Elder*, 2017 WL 2720007, at *11. On appeal, Kling argues that there were too many potential signatories

---

[2] Elder and Lawrence were both housed in the A-Block section of the Attica facility.

16

to review, nor could Kling have known, as a vocational supervisor and not a corrections officer, about the existence of these records at the time of the hearing.

On the basis of the uncontested facts in the record, we agree with Elder that he was denied due process by Kling's failure. As further discussed below, we conclude that Elder is entitled to summary judgment against Kling on this issue.

We step back, first, and recall that a sentence requiring an inmate to serve time in the SHU represents a substantial loss of liberty even for a lawfully imprisoned person. As noted above, the confinement is much more restrictive and other conditions, such as unrelenting light and lack of exercise, are harsh. Accordingly, our prior rulings have left no room to doubt that "certain due process protections must be observed before an inmate may be subject to confinement in the SHU." *Smith v. Fischer*, 803 F.3d 124, 127 (2d Cir. 2015) (alterations and internal quotation marks omitted); *accord Wolff v. McDonnell*, 418 U.S. 539, 566 (1974). These protections include providing the inmate with "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Smith*, 803 F.3d at 127 (internal quotation omitted).

As the Supreme Court has observed, "[c]hief among the[se] due process minima . . . [i]s the right of an inmate to call and present witnesses . . . in his defense before the disciplinary board." *Ponte v. Real*, 471 U.S. 491, 495 (1985). An inmate's request to call witnesses may be denied due to "irrelevance or lack of necessity," or where "granting the request would be unduly hazardous to institutional safety or correctional goals." *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (internal quotation marks omitted). The burden to defend such a denial, however, "is not upon the inmate to

17

prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of the position." *Id.* at 30-31.

Our decision in *Kingsley* controls the outcome on this issue. In *Kingsley*, an inmate was accused of refusing to provide prison authorities a urine sample for a drug test. Defending this charge, the inmate swore that he did not in fact refuse but was merely nervous and could not urinate promptly when directed to do so. He requested that the hearing officer call as witnesses other inmates who had participated in the drug test that day and who might corroborate his explanation. The hearing officer declined to do so on the basis that the accused inmate "could not identify [the witnesses] by name." *Id.* at 28. He then adjudged the inmate guilty and sentenced the inmate to the SHU as punishment.

On appeal from the district court's dismissal of the inmate's lawsuit, we concluded that his due process rights had been violated. The record showed that the prison staff had a list of the 36 inmates who had been designated for the test at the relevant time. *Id.* We held accordingly that, while "prison officials can normally insist that a prisoner identify the names of his prospective witnesses, it was arbitrary to insist on this requirement here where the need for the witnesses was especially compelling, their identities were readily available to the prison officials, and [the inmate's] inability to identify them by name was understandable." *Id.* at 31 (footnote omitted).

Here, it was similarly unreasonable for Kling to expect Elder to be able to name the relevant officers. If he in fact did not commit the forgery and submit the disbursement forms in question, he would have had no way of knowing which officers countersigned them. Moreover, during the district court proceedings, none disputed that the information identifying these officers was "readily available" (as we put it in *Kingsley*) to prison officials through the A-Block logbook and facility staffing charts. *Id.*

Kling's effort to identify the relevant officers was patently insufficient. He asserts that he spoke to five officers in Elder's cell block and looked for clearer copies of the disbursement forms. Defendants offer no evidence, however, concerning which officers Kling spoke to, how he selected them, what he asked them, or whether he showed them the Lawrence forms. Further, looking for clearer copies of the forms was very likely to be ineffective: The problem was not that the signatures, and in some instances, the mere initials, were obscured or too faint to make out; rather, it was that they were unintelligible to a stranger because they were scribbled, as many signatures are. But they should have been readily recognized by the signatory.

Now, for the first time on appeal, Defendants assert that Elder failed to prove "that the requested officers could have been easily identified by using the staffing records." Appellees' Br. 31. Because this argument was not raised before the district court, we treat it as waived. *See Millea v. Metro-North R.R.*, 658 F.3d 154, 163 (2d Cir. 2011). To the extent it raises new factual questions, it is prudent to do so. But even were we to assume that the argument was not waived, it would fail on the merits.

To begin with, under *Kingsley*, the burden falls on Kling "to prove the rationality of" declining to take the obvious step of consulting the staffing records to identify Elder's requested witnesses. *Kingsley*, 937 F.2d at 31. Kling did not even attempt to meet this burden, and instead rested on his argument—which we have now rejected—that the meager and apparently casual efforts he did make were sufficient to satisfy due process obligations on this critical issue.

Moreover, nothing on the face of the disbursement forms, the hearing transcript, and the staffing records suggests that the countersigning officers were, in fact, not readily identifiable using those records. As evident from the forms and the transcript of Elder's disciplinary hearing, the forms were approved and stamped by "hall captains,"

19

App'x 307, 309-12, 322-24, two of whom were on duty in any given day. The names of the designated hall captains for a particular day are listed in both the A-Block logbook and on the staff planning grid. *See* App'x 164-84, 201-213. (Hall captains are designated "H.C." in the logbook and "A-Block #1" in the planning grid.) Although the signatures or initials on the disbursement forms may have been illegible, the date on which each form was signed was plainly visible. *See* App'x 307-12. Accordingly, without accounting for instances in which a single hall captain approved more than one form, for each disbursement form at issue it appears that Kling would have had to interview at most two officers assigned to duty in that place and on that date to determine who had approved the form. This, he did not do, as the record establishes without any genuine dispute.[3]

## II.    The quality of the assistance provided by MacIntyre

As discussed, the parties dispute what exactly Elder asked his corrections officer assistant MacIntyre to do for him to help Elder prepare for the hearing while Elder was confined in keep lock. As the district court acknowledged, on a motion for summary judgment, the court was required to credit the testimony of Elder, as the non-moving party. *Elder*, 2017 WL 2720007, at *5.

According to Elder, he asked MacIntyre to interview the officers who had approved the disbursement forms in advance of the disciplinary hearing. Elder testified in his deposition that he also asked MacIntyre to obtain copies of the allegedly forged forms and of "Chapter V," the regulations governing the hearing. We conclude that

---

[3] One might also have expected MacIntyre, as the individual charged with the relevant investigation, to pursue this reasonable possibility. We discuss the import of his failure to do so below, separately from Kling's failure.

MacIntyre's reported failure to carry out Elder's requests, if proven, would constitute a due process violation. Elder is entitled to a trial to determine what assistance he in fact requested and whether MacIntyre failed to provide him that assistance.

### A. Failure to identify and interview witnesses

Due process principles require prison authorities "to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988). When the inmate is confined before the hearing, "the duty of assistance is greater because the inmate's ability to help himself is reduced." *Id.* Such required assistance includes "gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses." *Id.* at 898.

This constitutional obligation is violated by a "failure to . . . interview an inmate's requested witnesses without assigning a valid reason." *Fox v. Coughlin*, 893 F.2d 475, 478 (2d Cir. 1990). As with the failure to make witnesses available at a disciplinary hearing, "[t]he burden is not upon the inmate to prove the [assistant's] conduct was arbitrary and capricious, but upon the [assistant] to prove the rationality of his position." *Id.* Moreover, "the assistance must be provided in good faith and in the best interests of the inmate." *Eng*, 858 F.2d at 898. For instance, "an assistant . . . who is requested to interview a group of prisoners too numerous to interview must attempt to determine independently who the most relevant witnesses might be and to interview them." *Id.*

Although we have not "define[d] the assigned assistant's precise role and the contours of the assistant's obligations," we have noted that "[a]t a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself." *Id.*; *see also Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993) ("[A]n

21

assistant must be assigned to the inmate to act as his *surrogate*—to do what the inmate would have done were he able."). The assistant has no duty, however, "to go beyond the specific instructions of the inmate"; otherwise, "he would then be acting as counsel in a prison disciplinary proceeding, assistance to which a prisoner is not entitled." *Silva*, 992 F.2d at 22.

Considering how easily MacIntyre could have identified Elder's requested witnesses by consulting prison records (and taking as true Elder's account of the relevant facts, as we must at this stage of the proceedings), we think MacIntyre could be shown to have fallen short of meeting his constitutional obligation to assist Elder "in good faith and in the best interests of the inmate." *Eng*, 858 F.2d at 898.

The district court granted summary judgment on this issue to MacIntyre, citing *Silva* for the proposition that an assistant need do only "what the inmate would have done were he able" and not confined pending the hearing, and concluding that the undisputed facts show that MacIntyre met that standard. *Silva*, 992 F.2d at 22. In particular, the court concluded that MacIntyre had no obligation to check the prison staffing records because "it cannot be plausibly maintained that facility rules would have permitted Plaintiff, an inmate, to inspect the corrections officers' log books in order to prepare for his hearing." *Elder*, 2017 WL 2720007, at *9.

The court erred by applying this standard. In *Silva*, we held only that an assistant has "no constitutional duty to go beyond the bounds of [the inmate's] specific instructions" and rejected the inmate's argument that his assistant should have interviewed witnesses the inmate never asked him to interview. 992 F.2d at 22. We set no limit on the types of specific tasks an assistant may be required to perform upon an inmate's request. In fact, in *Eng*, a case whose principles we reaffirmed in *Silva*, we declined to define a constitutional maximum and referred to the tasks an inmate, "were

22

he able, could perform for himself," as a constitutional "minimum." 858 F.2d at 898. Similarly, in *Ayers v. Ryan*, 152 F.3d 77 (2d Cir. 1998), we held that an inmate did not receive the process he was due when his appointed assistant failed to interview two witnesses in a facility from which the plaintiff inmate had been transferred, including one witness whom the plaintiff identified only by cell number, *id.* at 79, 81. We so held notwithstanding the observation that the plaintiff inmate would likely not have been permitted to do so himself, by regulation, and that it would have been difficult, if not impossible, for the inmate to do himself as a practical matter.

In sum, although we have not traced the outer contours of an inmate assistant's constitutional duties, we have previously held that assistants are constitutionally obligated to perform tasks far more burdensome than, as here, consulting readily available prison records for a handful of names even if those tasks may not be permitted to the inmate. *See, e.g.*, *id.*; *Eng*, 858 F.2d at 898.

### B. Failure to provide Elder with requested documents

Elder avers that he asked MacIntyre for copies of the allegedly forged disbursement forms and the Chapter V regulations, and that MacIntyre failed to procure these documents but gave no reason for his failure. Again taking Elder's version of the facts to be true, we conclude that MacIntyre's failure to procure Elder's requested documents was similarly a failure to assist him "in good faith and in [his] best interests." *Eng*, 858 F.2d at 898.

The district court recognized that a factual dispute existed, but nonetheless granted summary judgment to MacIntyre as to this claim, even assuming that Elder requested these documents. The district court reasoned that MacIntyre's failure to obtain them was "harmless error" because, at the hearing, Elder was able to "view, if not hold" the disbursement forms, and in any case, MacIntyre's failure to provide the

23

requested documents could not have affected the outcome of the hearing. *Elder*, 2017 WL 2720007, at *9.

The district court erred. Even assuming that the deficiency could have been cured at the hearing, under Elder's version of events, he was not given sufficient opportunity to review the disbursement forms at that time, because Kling kept them "by his side" and merely "flipped through them." App'x 266. Further, as discussed more fully below, *infra* Part IV, the evidence presented at the hearing was insufficient to support the conclusion that any procedural violations caused Elder no cognizable harm. Elder was entitled to pursue this claim as to any factual differences and to obtain at least nominal damages should he prevail.

## III.  Adequacy of notice

Elder contends that he was denied due process because he did not receive adequate notice of the charges made against him and asks this Court to enter summary judgment in his favor on this claim. The district court did not address whether the misbehavior report contained sufficient detail to comport with due process. Instead, the court noted Elder's citation of 7 N.Y.C.R.R. 251-3.1—a New York state regulation requiring prison misbehavior reports to include the incident date, among other facts— and concluded that "violation of such procedures does not amount to a federal due process violation." *Elder*, 2017 WL 2720007, at *7 n.24. Defendants, for their part, argue that the report was adequately specific to comport with due process demands. They contend that "the inclusion of 'all facts relevant to [the] date' in a misbehavior report is not necessary so long as there is sufficient information to allow the inmate to identify the conduct at issue." Appellees' Br. 35 (quoting *Sira*, 380 F.3d at 72) (brackets ours).

In a prison disciplinary proceeding, "[d]ue process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours

24

prior to conducting a disciplinary hearing." *Sira*, 380 F.3d at 70. Critically, our precedents have taken a functional approach to assessing the adequacy of notice in this context: we have held that notice is constitutionally adequate when it is sufficiently "specific as to the misconduct with which the inmate is charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Id*. (quoting *Taylor v. Rodriguez*, 238 F.3d 188, 192–93 (2d Cir. 2001) (internal quotation marks omitted)). Accordingly, to satisfy due process concerns, the notice given need not "painstakingly detail[] all facts relevant to the date, place, and manner of charged inmate misconduct"; it must simply permit a "reasonable person" to "understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id*. at 72.

In advance of his disciplinary hearing, Elder received a two-page misbehavior report form prepared by McCarthy. App'x 297-98. The report stated that the total amount of larcenous withdrawals was $630. *Id*. The report also (1) cited the rules that Elder was charged with violating; (2) described the alleged misconduct, that is, forging disbursement forms over an unspecified course of time and using them to steal from another inmate's account; and (3) identified the other inmate (Lawrence). This information was sufficient to advise Elder of what he was accused of doing—forging and stealing. As the record demonstrates, the misbehavior report provided enough material for Elder to attempt to prepare a defense, by asking MacIntyre to provide copies of the forms at issue and to identify relevant evidence. The questions Elder posed to Kling and McCarthy at the hearing further make clear that he understood the charges against him and had considered possible defenses. *See, e.g.*, App'x 57 (asking McCarthy whether he qualified as a "handwriting specialist" and asking McCarthy whether it is

25

Attica's policy for correction officers to verify inmate ID before accepting disbursement forms). Under our precedents, Elder thus received adequate notice.

Although Elder was not able to examine the relevant disbursement forms until his hearing, we are aware of nothing in the record to suggest that this limitation resulted from any information missing from the misbehavior report; rather, as discussed above, it was a product of MacIntyre's failure to obtain and provide the relevant forms. That Elder was ultimately unable to mount an adequate defense is attributable, rather, to a distinct due process violation: the allegedly inadequate assistance provided him by MacIntyre. We therefore affirm the district court's dismissal of Elder's due process claim insofar as it is based on a theory of inadequate notice.

## IV.    Sufficiency of the evidence

Elder asserts, finally, that the evidence presented to Hearing Officer Kling was insufficient to support his conviction for forgery and stealing. In rendering his oral decision, Kling identified that the evidence in the hearing record consisted of the McCarthy report; the seven Lawrence disbursement forms; a cashed check drawn from Lawrence's account showing the same payee, amount, and number as one of the Lawrence disbursement forms; a disbursement form completed by Elder; and McCarthy's testimony. In his written disposition, under the heading "statement of evidence relied upon," Kling wrote that he "relied upon the verbal testimony given by Sgt. McCarthy in addition to the written misbehavior report." App'x 65. He added that "[t]he visual evidence of the signature was compelling in the similarities." *Id.*

The district court found, and Defendants assert, that McCarthy and Kling's determination that the handwriting on the Lawrence forms matched Elder's was sufficient to support the conviction. In the circumstances presented, we are unable to agree.

26

The Supreme Court instructed in 1985 that due process prohibits disciplinary action affecting an inmate's liberty interest without "some evidence" of guilt. *Superintendent v. Hill*, 472 U.S. 445, 454 (1985); *Gaston v. Coughlin*, 249 F.3d 156, 163 (2d Cir. 2001). A reviewing court's application of this standard "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." *Hill*, 472 U.S. at 455. Rather, the court considers "whether there is *any evidence* in the record that could support the conclusion reached by the disciplinary board." *Id.* at 455-56 (emphasis added).

Read at its most expansive, the Court's 1985 articulation suggests a low standard indeed. In this Circuit, however, we have not "construed the phrase 'any evidence' literally." *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004). Rather, we have required that such disciplinary determinations be supported by some "*reliable* evidence" of guilt. *Id.* (emphasis added) (internal quotation marks omitted); *accord Sira*, 380 F.3d at 76. "Due process does not permit a hearing officer simply to ratify the bald conclusions of others; it requires some inquiry to determine whether the totality of facts and circumstances reasonably supports the proffered conclusion." *Sira*, 380 F.3d at 80.

Elder's sufficiency challenge "presents an issue of law subject to our plenary review." *Id.* at 76. On such review, we conclude that Kling's findings that Elder was guilty of both forgery and theft were not supported by some *reliable* evidence. *Luna*, 356 F.3d at 488. Although the record demonstrates that Kling inspected the Lawrence disbursement forms and concluded that the handwriting on those forms was similar to the handwriting on Elder's documents, the entire proceeding rested on the assumption—one unsupported by any direct evidence and supported by McCarthy's report only by inference—that forgery and theft had occurred. The hearing record lacked any direct evidence that Lawrence had complained of theft or forgery, or that money was withdrawn from Lawrence's account against his will.

27

Further, the hearing record before Kling contained no samples of withdrawal forms submitted by Lawrence in the past, or any reliable sample of Lawrence's signature to suggest that the targeted forms were in fact forgeries. Thus, in the absence of a reliable sample of Lawrence's signature on a withdrawal form, Elder was accused of forgery based merely on the fact that the written signatures on the targeted forms looked similar to his handwriting. This unusual aspect of the record persuades us that, in the circumstances of this case, the evidence before Kling was insufficient to find Elder guilty of theft and forgery.

In similar vein, in Elder's state administrative proceeding, the Fourth Department alluded to Lawrence's silence as a factor supporting its determination. *Elder*, 115 A.D.3d at 1177-78. As it pointed out in granting Elder's Article 78 petition, "there is no indication in the misbehavior report that the sergeant showed [Lawrence] the disbursement forms or that [Lawrence] claimed that it was not his signature on the forms. There likewise was no evidence to that effect presented at the hearing." *Id*. at 1178. Bearing in mind the applicable sufficiency standard here, which we recognize is more lenient than that imposed by New York law, we conclude that the evidence before Kline was insufficient to find Elder guilty of theft and forgery. *See Sira*, 380 F.3d at 76 n.9. Elder is entitled to entry of summary judgment in his favor on this due process ground.

## V.        Qualified Immunity

As now relevant to Elder's due process claims, Defendants assert in the alternative that, even if Defendants' conduct violated due process, they are entitled to qualified immunity from his claims. Defendants did not raise this argument at summary judgment, however, except as to Superintendent Bradt.

28

The defense of qualified immunity "may be waived if, as here, the defendants failed to move for summary judgment on this defense, even if, also as here, the defendants asserted the defense in their answer." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016). On this record, we conclude therefore that every Defendant except Bradt—and MacIntyre—has waived qualified immunity as a defense. We perceive no risk of manifest injustice. Defendants "proffer no reason for their failure to raise the arguments below." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008) (internal quotation marks omitted). Thus, the circumstances of this case appear not to "militate in favor of an exercise of discretion" to address qualified immunity in this posture. *Id* (internal quotation marks omitted). Because we remand Elder's due process claim against MacIntyre for inadequate assistance, however, and decide that it cannot be resolved now as a matter of law, we conclude that MacIntyre did not waive his qualified immunity defense.

When a plaintiff shows facts making out a violation of a constitutional right, a defendant may establish the affirmative defense of qualified immunity by demonstrating that (1) the right was not "clearly established" or (2) even if the right was "clearly established," "it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The law of qualified immunity "does not require a case on point concerning the exact permutation of facts that state actors confront in order to establish a clear standard for their behavior." *Hancock v. County of Rensselaer*, 882 F.3d 58, 69 (2d Cir. 2018). Below, we examine the defense as it would apply to each defendant.

*Kling: Failure to produce witnesses.* We established in *Kingsley* that a hearing officer is required to identify the witnesses an inmate seeks to call using "readily available" prison records, 937 F.2d at 31 & n.6, even where the inmate cannot "identify [the witnesses] by name," *id.* at 30. Kling made a paltry effort to do so. Nor does he

argue that he was somehow reasonably ignorant that those records existed. In light of our guidance in *Kingsley*, Kling's ineffectual efforts to identify Elder's requested witnesses were not "objectively reasonable." Kling is not entitled to qualified immunity.

*MacIntyre: Inadequate assistance.* Because Elder's claim against MacIntyre cannot be resolved as a matter of law and remains to be adjudicated, we conclude that, on remand, the status quo ante should be restored for both Elder and MacIntyre. Thus, MacIntyre should not be penalized for failing to address this affirmative defense in opposition to a motion that was (in relevant part) without merit; he may raise the defense in future proceedings in the district court.

*Kling and McCarthy: Insufficient notice.* Because we affirm the district court's dismissal of Elder's due process claim based on a theory of insufficient notice, we need not address whether Kling and McCarthy are entitled to qualified immunity on this claim.

The district court also dismissed claims against McCarthy, Bradt, and Prack based on its rulings that the other Defendants hadn't violated due process. As discussed, Elder brings due process claims against McCarthy on allegations that he filed a false misbehavior report, and against Bradt and Prack for summarily affirming Kling's ruling. The district court dismissed those claims based on its conclusion that Elder ultimately received constitutionally adequate process. Because we conclude otherwise, the claims should be allowed to proceed.

## VI. Eighth Amendment Claim

The district court granted Defendants' motion to dismiss Elder's Eighth Amendment claim. Although the court acknowledged that Elder's allegations of the SHU's unsanitary conditions were his "most compelling" support for the claim, it ultimately concluded that he had not plausibly alleged that any Defendant knew about

30

or was deliberately indifferent to those conditions. *Elder*, 2015 WL 5254290, at *8. The district court dismissed the claim without providing Elder an opportunity to seek leave to amend: it did so by directing Defendants to answer only those parts of the amended complaint that survived the motion to dismiss. Elder now argues that he should have been given leave to amend. We agree.

Where a district court "cannot rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim," a pro se complaint "should not be dismissed without granting leave to amend at least once." *Shomo v. City of New York*, 579 F.3d 176, 183-84 (2d Cir. 2009) (alterations and internal quotation marks omitted). Here, the district court could not have permissibly ruled out the possibility that one of the Defendants knew about, or was deliberately indifferent to, the conditions Elder endured in the SHU. For example, Defendant Prack might plausibly have had the necessary scienter in light of his responsibilities as Director of Special Housing/Inmate Disciplinary Programs. Alternatively, Elder might have amended his complaint to add defendants who demonstrably knew of and were responsible for his living conditions.

Defendants now argue that the district court correctly denied leave to amend because any amendment would have been futile. They claim that the unsanitary SHU conditions as alleged could not support an Eighth Amendment claim—a conclusion that the district court declined to reach—and that any claims raised now against new defendants would be time-barred. These arguments would be better addressed by the district court in the first instance, upon review of Elder's actual allegations proffered in an amended complaint and with the benefit of full briefing.

Accordingly, the district court is directed on remand to allow Elder to amend his complaint to replead his Eighth Amendment claim.

## CONCLUSION

To summarize:

1) We REVERSE the judgment of the district court as to Elder's due process claim that Defendant Kling failed to produce witnesses and direct that summary judgment be entered in Elder's favor;

2) We AFFIRM the judgment of the district court as to Elder's due process claim that Defendants Kling and McCarthy failed to provide Elder with adequate notice of the charges against him in advance of his disciplinary hearing;

3) We REVERSE the judgment of the district court as to Elder's due process claim that his disciplinary conviction was supported by "some" evidence and direct that summary judgment be entered in Elder's favor;

4) We VACATE the judgment of the district court with respect to Elder's due process claim against Defendant MacIntyre for inadequate assistance and REMAND the cause for trial;

5) We VACATE the judgment of the district court in Defendants' favor as to Elder's Eighth Amendment claim and REMAND the cause with instructions to allow Elder to file an amended complaint;

6) We VACATE the district court's judgment that Defendants Kling, McCarthy, Bradt, and Prack are entitled to qualified immunity with respect to Elder's due process claims and REMAND the cause with instructions to conduct further proceedings consistent with this reversal.

For the reasons set forth above, the judgment of the district court is AFFIRMED in part, REVERSED in part, and VACATED in part as set forth above. The cause is REMANDED with instructions to (1) enter judgment for Elder on his due process claims based on sufficiency of the evidence and failure to produce witnesses; (2) grant Elder leave to replead his Eighth Amendment claim; and (3) conduct further proceedings consistent with this Opinion on all remaining claims.